## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**ANTHONY HAIRSTON,**

**CASE NO.: 3:13-cv-1457-J-32BT**

**Plaintiff,**

**vs.**

**ED NELSON TRANSPORT,**
**a Foreign Profit Corporation and**
**ED NELSON, Individually,**

**Defendants.**

_____/

## DEFENDANTS' DAUBERT MOTION TO EXCLUDE EXPERT TESTIMONY

**COME NOW** the Defendants, **ED NELSON TRANSPORT** and **ED NELSON**, by and through their undersigned counsel, pursuant to Local Rule 3.01 and Rule 7 of the Federal Rules of Civil Procedure, and hereby file this Motion to Exclude the Testimony of Plaintiff's expert witness, David Dorrity, at trial and as grounds therefore, state the following:

### SUMMARY OF THE ARGUMENT

Plaintiff's expert, David Dorrity's expert opinion boils down to this: that Defendant, Ed Nelson, should have gotten out of his truck and looked to see if anyone was behind him before backing up his truck, and should have honked his horn before backing. Classifying such an elementary opinion as "expert testimony" is improper and prejudicial to the Defendants, and would be more suitable as lay witness testimony. Mr. Dorrity's "expert" opinion concerns matters within the everyday knowledge and experience of a lay juror and accordingly, will not aid the jury in understanding the

evidence or determining facts at issue in this case. Moreover, Mr. Dorrity's opinion is founded upon speculative data, as it is based upon the conflicting testimonies of the Plaintiff and the Defendant. Consequently, Mr. Dorrity's opinion testimony should be excluded from trial as it fails to satisfy the standards under Rule 702, Federal Rules of Evidence, and Daubert and its progeny.

## FACTS

The incident which is the subject of this suit occurred on June 16, 2011, when the Plaintiff claims that the Defendants' trailer backed into him, allegedly causing injury to his neck, left shoulder, and upper and lower back. Plaintiff has retained David Dorrity to provide expert testimony regarding regulatory and other transportation and/or commercial vehicle standards applicable to the Defendants. Defendants deposed Mr. Dorrity on May 14, 2015.

## ARGUMENT AND MEMORANDUM OF LAW

In Daubert v. Merrell Dow Pharmaceuticals, Inc., the United States Supreme Court held that, under Federal Rule of Evidence 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. 579, 589 (1993). The Court described the trial court as a "gatekeeper" so that rather than simply admitting all such testimony and leaving it to the jury to determine its weight, the trial court should screen such evidence to ensure that expert testimony is both relevant and reliable. Id. Expert testimony, by its very nature, has a significant risk of being both powerful and misleading; accordingly, the trial court must exercise more control over experts than over lay witnesses. Id. at 595. As the Eleventh Circuit has recognized:

> The importance of a trial court's gate keeping function cannot be overstated. The objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether being testimony on professional studies or personal experience, *employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.* The district court's role is especially significant since the expert's opinion "can be both powerful and quite misleading because of the difficulty of evaluating it".

United States v. Frasier, 387 F. 3d 1244, 1260 (11th Cir. 2004) (citations omitted) (emphasis added).

In 2000, Congress amended Rule 702 of the Federal Rules of Evidence to incorporate the "gatekeeper" holding of Daubert and it progeny. Under the rule, the trial court must ensure not only that the proffered witness is "qualified as an expert by knowledge, skill, experience, training or education" but also that the testimony is a) helpful to the trier of fact in understanding the evidence or determining fact at issue, b) based upon "sufficient facts or data," c) that it is the "product of reliable principles and methods," and d) that the witness "reliably applied the principles and methods to the facts of the case." Fed R. Evid. 702.

Daubert applies to *all* expert testimony, and not just to testimony that can be called scientific in nature. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999). Accordingly, although "experiential expert testimony does not rely on any scientific evidence that is characterized by its falsifiability, or refutability, or testability," it is admissible under Rule 702. Maggard v. Essar Global Ltd., 2015 WL 1498965, at *3 (W.D. Va. Apr. 1, 2015) (quoting U.S. v. Wilson, 484 F.3d 267, 274 (4th Cir. 2007)) (internal quotations omitted). However, "[t]he district court must nonetheless require an experiential witness to explain how [his] experience leads to the conclusion reached, why

3

[his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." Id. "If the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is unreliable." Graves ex rel. W.A.G. v. Toyota Motor Corp., 2011 WL 4590768, at *6 (S.D. Miss. Sept. 30, 2011).

Moreover, as "Rule 702 is broadly interpreted, and helpfulness to the trier of fact is its 'touchstone.' ... Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir.1993). "To determine whether an expert witness will assist the jury, the proper inquiry is whether a layman is competent to determine the particular issue for himself, or whether he cannot reasonably form his own conclusion on that issue without the assistance of the expert." Medina v. 3C Const. Corp., 2005 WL 5960937, at *2 (S.D. Fla. Sept. 26, 2005); U.S. v. Torres-Galindo, 206 F.3d 136, 141 (1st Cir.2000) (finding that expert testimony was improperly admitted because it was likely not helpful, as it covered an area with which the jury, "out of its own experience," was familiar). Furthermore, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Delgado v. Delta Air Lines, Inc., 2013 WL 9838333, at *6 (S.D. Fla. Aug. 21, 2013).

The proponent of expert testimony must establish its admissibility by a preponderance of the evidence. See McCorvey v. Baxter Healthcare Corp., 298 F. 3d 1253, 1256 (11th Cir. 2002) (burden of laying proper foundation for admission of expert testimony is on party offering the expert); see also, Fed R. Evid. 702 Advisory

Committee's Note (2000 Amendments) ("the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence").

In <u>Merritt v. Old Dominion Freight Line, Inc.</u>, the defendant moved to preclude the expert testimony of the plaintiff's expert on commercial motor vehicle operations, human resources and safety, trucking, and motor fleet carrier safety and risk management, which included thirteen conclusions. 2011 WL 322885, at *4 (W.D. Va. Feb. 2, 2011). The court found that two of these conclusions, which the expert drew from factual allegations in the plaintiff's deposition testimony, and which were based on the plaintiff's alleged fear of retaliation, were inadmissible at trial because the expert's "interpretation would not assist the trier of fact" and the "jury would be well qualified to evaluate [the plaintiff's] credibility, and the reasonableness of her fears." <u>Id.</u> at *7.

In <u>Graves ex rel. W.A.G. v. Toyota Motor Corp.</u>, the plaintiff argued that defendants' expert witness' testimony merely relied on studies that did "nothing more than formalize what the ordinary juror would know—that an inattentive driver may be subject to an increased risk of impaired driving performance." 2011 WL 4590768, at *6 (S.D. Miss. Sept. 30, 2011). The court agreed and accordingly found that the expert's conclusions relative to driver inattention would not be helpful to the jury, and therefore excluded testimony regarding these conclusions from trial. <u>Id.</u> at *7.

In the instant matter, Defendants do not contest Mr. Dorrity's qualification as an expert in the field of transportation or commercial motor safety. Rather, Mr. Dorrity's opinion testimony should be excluded as it will not aid the jury in understanding the evidence or determining facts at issue, is not based upon sufficient facts or data produced

by reliable principles and methods, and which Mr. Dorrity has not reliably applied to the facts of this case.  Here, the Plaintiff cannot meet, by a preponderance of the evidence, his burden to admit Mr. Dorrity's testimony because it does not satisfy the standards under Rule 702 and <u>Daubert</u> and its progeny.

First and foremost, and similar to both <u>Merritt</u> and <u>Graves</u>, Mr. Dorrity's opinion testimony does not satisfy the "touchstone" requirement of helpfulness to the trier of fact. Mr. Dorrity's "expert opinion" boils down to this: that Defendant, Ed Nelson, should have gotten out of his truck and looked to see if anyone was behind him before backing up his truck, and should have honked his horn before backing.  (Dorrity deposition, pages 56-57.)  This opinion concerns matters which are unquestionably within the everyday knowledge and experience of a lay juror.  Like <u>Graves</u>, where the court agreed that an ordinary juror would know that an inattentive driver would be more likely to drive poorly, here, the average juror would be familiar with the concept that a tractor-trailer driver may need to get out and look and honk before backing; this concept is not outside their realm of knowledge and it does not require an expert to explain that idea.

Mr. Dorrity formed his opinions based upon the conflicting deposition testimonies of the Plaintiff and the Defendant.  Although Mr. Dorrity makes reference to several commercial driving manuals, including the Tractor-Trailer Driver Workbook, the 2009 Uniform Commercial Driver's License Manual, the National Safety Council's defensive driving course for professional truck drivers, the National Safety Council's Preventability Determination Manual, and the Federal Highway Administration's Commercial Vehicle Preventability Accident Manual, he does not apply the information in these manuals to the facts of this case. (Please see Exhibit "A," Deposition of David Dorrity 21:2 to 22:8).

Rather, Mr. Dorrity does the opposite, and merely cites to these manuals to bolster his opinions.

Regarding the Tractor-Trailer Driver Workbook, he refers to a "tip" it offers to help a driver remember what to do when backing: "this particular tip for backing is the acronym GOAL, G-O-A-L, which stands for Get Out And Look." (Exhibit "A," 23:4-6). Regarding the Commercial Driver's License Manual, Mr. Dorrity found significant its instructions that a driver is "encouraged to look at his path, look at his line of travel before he begins" (Exhibit "A," 23:4 to 24:1), and that a driver should "back slowly" because "when we do everything slow, it just makes for a safer environment." (Exhibit "A," 24:23, 24:25 to 25:2).  He further testified that,

> "[u]sing the mirrors is also something that could be applicable here. Mr. Nelson did indicate that he was looking in his mirrors. I'm not exactly sure why he wouldn't have observed Mr. Nelson [sic]. **I don't have any better idea or insight than what he has already testified to.**"
> (Exhibit "A," 25:8-13) (emphasis added).

Regarding the National Safety Council's defensive driving course, Mr. Dorrity testified that the course, again, teaches drivers "[t]o walk around your vehicle and get a complete picture of what you're backing into" (Exhibit "A," 26:24 to 27:1), and that "[a]gain, it mentions, and a lot of this is redundant, to back slowly, check both sides as you back." (Exhibit "A," 27:13-15).  As for the National Safety Council's Preventability Determination Manual, Mr. Dorrity first refers to its definition of a "preventable accident," but then does not apply that definition to the subject accident except to say that,

> "did Mr. Nelson do what he reasonably could? Not everything under the sun, but what he reasonably could. And it's my opinion that it be reasonable. In fact, I can't imagine a driver not thinking

it's reasonable to get out of his truck, get a little exercise, walk an
extra ten, fifteen feet . . . and look inside the hole."
(Please see Exhibit "B," Deposition of David Dorrity 29:3-10).

Firstly, this testimony does not apply the National Safety Council's principles to
the facts of this case, as experts are required to do under Federal law. Moreover, Mr.
Dorrity explains his opinion in terms of "reasonableness," which is not proper testimony
for an expert. Rather, testimony as to what reasonable behavior is within the purview of
a lay witness, who is prohibited from basing his opinion on "scientific, technical, or other
specialized knowledge." Fed. R. Evid. 701(c). The remainder of his testimony regarding
the Preventability Determination Manual, and then his testimony regarding the Federal
Highway Administration's Commercial Vehicle Preventability Accident Manual, are just
repetition of the tips given in the previously discussed manuals, i.e. get out and look.
(Exhibit "B," 29:12 to 31:17).

Although Mr. Dorrity cites to these several professional tractor-trailer driving
manuals and safety guides, he does not use any of them in forming his opinion. Instead,
Mr. Dorrity has found in these manuals the support he needs to bolster his opinion. His
process is directly opposite to the requirements under Daubert and Rule 702, i.e. that the
witness reliably apply the principles and methods to the facts of the case, not vice-versa
as Mr. Dorrity has done here.

Again, like Graves, where the expert's foundational data underlying his opinion
testimony was speculative and therefore unreliable, here, the information relied upon by
Mr. Dorrity in forming his opinions is similarly unreliable. The foundational data relied
upon by Mr. Dorrity in forming his opinions were the deposition testimonies of the
Plaintiff, Mr. Hairston, and the Defendant, Mr. Nelson.   Not unexpectedly, the

testimonies of the Plaintiff and the Defendant differ regarding how the subject accident occurred. Specifically, upon review of the respective depositions in an attempt to "synthesize all of the information," Mr. Dorrity was unable to determine when the loading dock door "actually finally [got] all the way to the top and completely raised." (Exhibit "C," Deposition of David Dorrity 48:7-10). He stated,

> Mr. Nelson testified that it was while he was on the ground at the back of his trailer, and then after the door was raised he went and got in the truck, which doesn't seem to mesh with Mr. Hairston's account that he is still rolling the door up.
> (Exhibit "C," 48:11-16).

Accordingly, as this "foundational data" relied upon by Mr. Dorrity is speculative, he should not be permitted to base his opinion on that data, because any opinion drawn from such data is unreliable.

Even if this Court finds that Mr. Dorrity's opinion is based upon sufficient facts or data produced by reliable principles and methods, which have been reliably applied to the facts of this case as required by Rule 702, his opinions still do not satisfy the "touchstone" requirement of helpfulness to the trier of fact. As Mr. Dorrity's opinion that the Defendant should have gotten out of his truck and looked and honked before backing is a matter which is certainly within the everyday knowledge and experience of a lay juror, an expert is not necessary to explain that concept. Moreover, Mr. Dorrity's opinion testimony will be of no assistance to the jury regarding the Plaintiff's theory of how the subject accident occurred, as this issue will be thoroughly addressed through other testimony and evidence, and therefore constitutes nothing more than needless cumulative evidence.

### 3.01(g) Certification

In accordance with Local Rule 3.01(g), counsel for Defendants and Plaintiff have conferred on the matters addressed in this motion and Plaintiff objects to the relief sought herein.

**WHEREFORE**, the Defendants respectfully request this Honorable Court grant their Motion to Exclude the Testimony of Plaintiff's expert witness, David Dorrity.

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via Electronic Mail to Chris Johns, Esq. and Zachary Von Roenn, Esq. via zvonroenn@chrisjohnslaw.com; epleading@chrisjohnslaw.com and Eric S. Block, Esq. and Fraz Ahmed, Esq. via eservice@ericblocklaw.com, on this 15th day of June, 2015.

**FERNANDEZ TRIAL LAWYERS, P.A.**

*/s/ Sorena Fallin*
**E.T. FERNANDEZ, III, ESQUIRE**
Florida Bar No. 371556
**SORENA S. FALLIN, ESQUIRE**
Florida Bar No. 019102
**ERIN-ELIZABETH DOLAN, ESQUIRE**
Florida Bar No.: 109433
8780-200 Perimeter Park Court
Jacksonville, Florida 32216
(904) 398-8008 (Phone)
(904) 398-0332 (Fax)
Attorneys for Defendants

# EXHIBIT "A"

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CASE NO.: 3:13-cv-01457-J-32JBT


ANTHONY HAIRSTON,

       Plaintiff,

  vs.

ED NELSON TRANSPORT,
a Foreign Profit Corporation
and ED NELSON, individually,

      Defendants.

---

DEPOSITION OF DAVID L. DORRITY, MHRD, CDS, CDT

---


DATE TAKEN:        Thursday, May 14, 2015
TIME BEGAN:        10:10 a.m.
TIME ENDED:        1:30 p.m.
LOCATION:          Huseby/Greenville
                   Merovan Office Suites
                   1200 Woodruff Road, Building A-3
                   Greenville, South Carolina  29607


REPORTED BY:       Elaine L. Grove-DeFreitas, RPR

7a2a2120-16b7-422b-be1f-d9dc3eba42c3

Page 21

1      Q      **Yes, please.  Let's go like one at a time.**

2      A      Sure.  The first four pages are from a

3   text known as trucking, Tractor-Trailer Driver

4   Handbook, Workbook.  These particular copies were

5   made from the second edition.  I have, I believe,

6   all of the editions that have been produced by this

7   organization.  But it's produced by the Professional

8   Truck Driving Institute of America.  And the pages

9   that follow the title page describe the training for

10   a professional truck driver regarding backing.

11           The next page, after those four, is an

12   excerpt from the 2009 Uniform Commercial Driver's

13   License Manual, page 2-9, where it discusses

14   backing.

15           Next is pages 58 and 59 from the National

16   Safety Council's defensive driving course for

17   professional truck drivers.  It also discusses

18   backing.

19           Next is a page from the National Safety

20   Council's Preventability Determination manual

21   regarding trucking accidents, and it's page 2.  And

22   among other things, it gives a definition of

23   preventability, and also the formula for being a

24   defensive driver.  And there is actually two pages

25   in that manual, pages 2 and page 13.  Page 13,

7a2a2120-16b7-422b-be1f-d9dc3eba42c3

Page 22

1    specifically the paragraph that deals with accidents

2    while backing.

3           And then lastly there is a page from the

4    Federal Highway Administration's Commercial Vehicle

5    Preventability Accident Manual, page 24, where it

6    talks about start-up, back-up procedures and advice

7    for drivers and management, specifically with a goal

8    in mind of preventing backing accidents.

9        Q     Okay.  And these are all documents that

10   you had in your possession at the time of your

11   retention?

12       A     That's correct.

13       Q     Okay.  Let's go through the first four

14   from the workbook, if you could tell me what the

15   significance of those documents are with regards to

16   your opinion produced in your report.

17       A     Well, all of the pages have little bits of

18   information that are relevant to this particular

19   case, and particularly the way Mr. Nelson should

20   have backed.  Some of these he did.

21          There is one significant thing he did not

22   do, but the first thing that is mentioned, and the

23   way this training material typically works is with

24   every concept or every particular maneuver that a

25   driver is asked to do, they may give some type of

7a2a2120-16b7-422b-be1f-d9dc3eba42c3

Page 23

1    tip or some type of acronym, or something like that

2    to help the driver remember when it comes to

3    backing.  Or if it were some other performance issue

4    like turning, to remember those things.  And this

5    particular tip for backing is the acronym GOAL,

6    G-O-A-L, which stands for Get Out And Look.

7            The general rules for backing safety, I

8    believe, are applicable and would be helpful for the

9    jury to understand and appreciate and let them make

10   their conclusions about whether or not Mr. Nelson

11   followed these things, where it talks about Inspect

12   Your Intended Path.  And without belaboring it too

13   much, I think that's essentially it.

14           The reason I copied these additional pages

15   is I wanted to give you a context.  In essence, I

16   copied the entire section for that topic of backing.

17      Q    **All right.  Moving on to the next.**

18      A    The next section would be the Commercial

19   Driver's License Manual and, specifically, under the

20   Backing Safely section, which is 2.2.4.

21      Q    **Okay.  And what significance does that**

22   **have with regards to your opinion?**

23      A    Well, there is a couple of things here.

24   The first is that the driver is admonished to --

25   encouraged to look at his path, look at his line of

7a2a2120-16b7-422b-be1f-d9dc3eba42c3

Page 24

1    travel before he begins.  Get out and walk around

2    the vehicle, check your clearance to the sides and

3    overhead and in the rear, near the path that your

4    vehicle will take.

5            There could be several applications to

6    that information, this instruction.  Obviously, if

7    he were backing up in a truck stop there would be

8    one particular type of method for fulfilling this

9    particular instruction.  If he was backing up to

10   a -- I'm going to call it a common dock where the

11   dock board, the entrance into the warehouse is

12   actually elevated and you're not backing inside a

13   building, it would be a different concept of the way

14   he would get out and surveil.

15           In our particular case, specifically where

16   the truck is going to back six feet inside of a

17   building and there are cavities, and I think the way

18   Mr. Baker describes it, a pit area on either side,

19   that's probably not a bad term, people can be there,

20   objects can be there.  There can be a number of

21   things that are latent to the driver unless he walks

22   back there.  So I believe that would be applicable.

23           Next would be back slowly.  I don't know

24   the speed that Mr. Nelson was backing.  But when we

25   do everything slow -- unless we are racing, when we

7a2a2120-16b7-422b-be1f-d9dc3eba42c3

Page 25

1    do everything slow, it just makes for a safer

2    environment.  If we drive slower, if we turn slower,

3    if we back slower, as a trucker, it just makes for

4    things going a lot smoother and a lot safer.  We can

5    correct a lot of ills and mistakes if we are doing

6    it slowly.  Give people a chance to get out of the

7    way, for example.

8              Using the mirrors is also something that

9    could be applicable here.  Mr. Nelson did indicate

10   that he was looking in his mirrors.  I'm not exactly

11   sure why he wouldn't have observed Mr. Nelson.  I

12   don't have any better idea or insight than what he

13   has already testified to.  It would seem reasonable

14   to me, though, that given the -- I realize that

15   there is two measurements of openings of this

16   particular dock door.  There is the lower section

17   and opening, and Mr. Baker describes it as being

18   very narrow.  And I measured it, it's 11 feet wide,

19   the trailer is eight-and-a-half feet wide, plus a

20   little bit additional space for the trailer doors.

21   So it's pretty slim.  But 11 feet is not much

22   smaller than a lane of travel.

23             Typically, a lane of travel is about 12,

24   12-and-a-half feet wide, 12-and-a-half feet; maybe

25   13 feet on the interstate, possibly.  But there is

7a2a2120-16b7-422b-be1f-d9dc3eba42c3

Page 26

1   an extended area up above that, which you could

2   observe a human if they were standing in that.  But

3   that would be applicable.  It is certainly something

4   that they need to do.  But I understand that he was

5   looking back into a dark area, I think is the way he

6   described it.

7            Next is the National Safety Council's

8   defensive driving course, where it describes the

9   backing guidelines for a professional truck driver.

10  This is a course that I personally trained in and I

11  actually became certified as a trainer.

12           The truck driving course, the defensive

13  course is similar.  The jury can think of it, if any

14  of them -- and I know nobody around this table has

15  ever had to do this, but if they ever had to go to a

16  vocation tech school to try to attend a boring class

17  during the day to get points back on their license,

18  this is the equivalency for truck drivers.  It's

19  designed as a defensive driving course, and unless

20  you're teaching it to your own employees, you can't

21  teach it for hire unless you have been certified.

22           And this course here teaches the drivers

23  to -- and this is a really good concept here, to get

24  out and get the picture.  To walk around your

25  vehicle and get a complete picture of what you're

Page 27

1    backing into.

2            And again, it's my opinion that if

3    Mr. Nelson had done this, and I can't imagine myself

4    ever backing inside a hole in a building and not

5    knowing what's back there, I just cannot imagine

6    doing that.

7            I mean, I sort of think would I ever back

8    out of my driveway without getting out and checking

9    to see if my grandkids are there?  Of course we all

10   have got backup cameras now, but we don't have that

11   benefit with commercial trucks yet.

12           You check the surface, see if there are

13   any depressions, fixed objects, pedestrian traffic.

14   So there it mentions it specific.  And it's

15   reasonable for him to have assumed that there was a

16   pedestrian, a worker.  Not really a pedestrian, but

17   a worker that was administering the rolling up of

18   that door.  I believe, if his testimony is believed,

19   he was confused.  That the door was, in fact, not

20   automatic.  He wasn't quite sure, but he eventually

21   concluded he thought it was automatic, but rather

22   required a human to roll it up.  And that human

23   would have to be standing right there, on the ground

24   in that pit area.

25           And then he checked side clearances, and

7a2a2120-16b7-422b-be1f-d9dc3eba42c3

# EXHIBIT "B"

First Choice Reporting & Video Services

Page 29

1          There is always a lot of excuses that take

2     place after people make a mistake, get hurt.  But

3     the question here is, did Mr. Nelson do what he

4     reasonably could?  Not everything under the sun, but

5     what he reasonably could.  And it's my opinion that

6     it be reasonable.  In fact, I can't imagine a driver

7     not thinking it's reasonable to get out of his

8     truck, get a little exercise, walk an extra ten,

9     fifteen feet, however far back away from the dock he

10    was, he said fifteen feet, and look inside the hole.

11    Look inside the pit.

12          And the National Safety Council has

13    defined a formula for defensive driving as such.

14    Some of this is applicable to recognize the hazard.

15    This should have been a recognizable hazard, that

16    someone could be inside that hole inside that

17    warehouse I'm backing into.

18          Two, understand the defense.  I have

19    described the defense, to walk back in there and

20    surveil.

21          And then three, to act correctly in time.

22    This is more of a vehicular crash type concept, but

23    I think it's applicable here.  That once you

24    surveil, like the other text has indicated, you get

25    back in your truck and then you act quickly,

7a2a2120-16b7-422b-be1f-d9dc3eba42c3

Page 30

1   checking your mirrors to make sure nothing changes.

2   That's page two.

3          But on page three of that same manual, it

4   gives guidance to the trucking industry when they

5   are looking back, in retrospect, about judging

6   whether or not an accident is preventable.  And

7   there are certain types of events or accident

8   categories that they have given guidance on that a

9   motor carrier should follow, and this would be used

10   for determining whether or not a driver is even

11   qualified to drive for you any more.

12          For example, if you said, "If you have two

13   preventable accidents in five years we will

14   terminate you," or whatever the policy might be,

15   here it says:  Accidents while backing, it says the

16   organization, meaning the trucking company, should

17   rule practically all accidents that occur while

18   vehicle is backing as preventable.  A professional

19   driver is not relieved of responsibility to back

20   safety when another person acts as a guide in the

21   maneuver.  He is ultimately in charge of that truck

22   and trailer.  Unless somebody is going to dive out

23   there behind him out of nowhere in a suicidal-type

24   mission, he is held responsible.

25          Lastly, the Federal Highway Administration

7a2a2120-16b7-422b-be1f-d9dc3eba42c3

Page 31

1   page, page 24, which deals with, again, the

2   preventability idea, this is a government-sponsored,

3   produced document where it's giving guidance to the

4   trucking company.  And frankly, it's one of the few

5   documents where the government ever stepped down and

6   gave defensive driving information, instruction to

7   the industry.  It talks about driving tips for the

8   driver.  Before start up, back up, walk around the

9   vehicle, look underneath.  Ensure you have safe

10  clearance to start.  Don't forget to check blind

11  areas on the right, and in front as well.  This is a

12  blind area.  To him, he could not see around that

13  corner unless he was Superman.

14          After you walk around, check, don't delay

15  in moving the vehicle again.  This is a little bit

16  of repetition, but good concepts that are typically

17  repeated elsewhere.

18          Check your mirrors.  Start up slowly.  Tap

19  horn in congested areas or recruit a signalman.

20          I'm not sure that a signalman would have

21  benefited in any way, so I'm not going to be

22  critical of Mr. Nelson for not having a helper or

23  signalman in this particular instance.

24          And, by the way, tapping the horn, and I

25  mention that in my report, is mentioned elsewhere in

7a2a2120-16b7-422b-be1f-d9dc3eba42c3

# EXHIBIT "C"

Page 48

1    they were automatic or manually.  In any event,

2    whether they are automatic or manual, I think the

3    driver should still go back there.  But I only bring

4    that up that it might help to explain why he did

5    what he did in shortcutting the safety process,

6    failing to do the GOAL, get out and look.

7            The only other thing, in review of the

8    deposition and trying to synthesize all of the

9    information, is when did this door actually finally

10   get all the way to the top and completely raised?

11           Mr. Nelson testified that it was while he

12   was on the ground at the back of his trailer, and

13   then after the door was raised he went and got in

14   the truck, which doesn't seem to mesh with

15   Mr. Hairston's account that he is still rolling the

16   door up.  And he is right there in harm's way, in

17   this pit, I can't imagine why he would want to

18   remain there and is struck.

19           When I was there I had the benefit of a

20   ladder that was put down there, I think by Chad or

21   one of the dock workers, to help me get up and down

22   when we went ahead and put a trailer into the door.

23   Otherwise, a guy my size, I might have a hard time

24   getting out of there.  But those are the two things

25   that jumped out after my second review.  If I review

7a2a2120-16b7-422b-be1f-d9dc3eba42c3