UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ANTHONY HAIRSTON,

                                    CASE NO.: 3:13-CV-01457-J-32JBT

        Plaintiff,

vs.

ED NELSON TRANSPORT,
a Foreign Profit Corporation and
ED NELSON, Individually,

        Defendants.

_____/

## PLAINTIFF'S *DAUBERT* MOTION TO STRIKE
## DEFENSE EXPERT, DR. TANNAHILL GLEN

     Comes now the Plaintiff, by and through his undersigned counsel and moves this Honorable Court to enter an Order striking Defense expert, Dr. Tannahill Glen, pursuant to Federal Rules of Evidence 702 and *Daubert*.  Dr. Glen misrepresented the actual test results, supported by Dr. James Butcher's Affidavit. See Exhibit A.[1] . Dr. Butcher created the test and the software relied upon by Dr. Glen in reaching her conclusions.

## STATEMENT OF FACTS

1. The Plaintiff is not seeking psychiatric damages and had no psychological expert designated to testify at trial.

2. At the insistence of the Defense, the Plaintiff was ordered to undergo a psychological evaluation by Defense witness Dr. Glen.

_____

[1] Exhibit A James N Butcher Affidavit 6-15-2015.

3.  On October 7, 2014, the Defense witness, Dr. Glen authored a report after administering a series of tests on the Plaintiff.  See Exhibit B.[2]

4.  Defense witness Dr. Glen diagnosed the Plaintiff with "probable malingered pain related disability" and "Somatic Symptom Disorder" in her report.  However, Dr. Glen failed to identify any specific test by name or score supporting her conclusions, thus depriving the undersigned of any real understanding as to the basis for her opinions.  See Exhibit B.[3]

5.  The undersigned was required to obtain the assistance of the Court compelling the witness to produce the basis upon which her conclusions were based including test manuals, raw data and test items.  See Exhibit C.[4]

6.  After receiving some of the items requested, it was still unclear as to the basis for Dr. Glen's opinion.  While she produced some 500+ pages of portions of manuals and pages from articles, she still produced no clear information setting forth which tests or scores she was relying upon, and no summary score sheet nor scales which supported her conclusions.

7.  Dr. Glen's report does not identify the names or scores of tests she relied upon to support her claims of malingering, violating various psychological standards.  In fact, such scores should be included in her report.  See Exhibit D.[5]  Her report failed to rely

---

[2] Exhibit B Dr. Tannahill Glen Report on October 7, 2014.

[3] Exhibit B Dr. Tannahill Glen Report on 10/7/14.

[4] Exhibit C This Court's order of 9/ll/14

[5] Exhibit D Practice Guidelines for Neuropsychological Assessment and Consultation (AACN Board of Directors 2007), page 226.  One recommended practice in clinical neuropsychology is to include numerical data (including scaled scores or percentile ranks) in reports" In fact, one of the reasons for this suggestion  that "inclusion of scores also increases accountability and may even minimize and clarify any interpretation biases or idiosyncrasies on the part  of the writer."

upon and in fact, outright ignores test manuals for interpretations when reaching her conclusions.  Members in her profession should "Strive to offer a complete statement of all relevant opinions that they formed…the basis and reasoning underlying the opinions, the salient data or other information that was considered in forming the opinions…"[6]

8.  Dr. Glen's October 7, 2014 report only indicated a *single* scale on the MMPI2, which showed excessive or exaggeration of symptoms.  See Exhibit B.[7]  However, at her deposition just three days before the *Daubert* motions were due, on June 11, 2015, some seven and half months later, she testified for the first time that she relied now on *three* new scales. These include MMPI2 to support somatic/over endorsement of symptoms; the FBS; and the Heilbronner scale.  See Exhibit I.[8]  At a minimum, any opinion testimony based upon these new scales should be stricken as untimely.

9.  Dr. Glen also produced documents not in context.  Since the complete documents were not provided, it is difficult to determine where they came from in order to even find the entire document.  For example, when pressed to determine the source of a

---

[6] Exhibit D Practice Guidelines for Neuropsychological Assessment and Consultation (AACN Board of Directors 2007), page 222:  "Standard procedures are followed in test administration and scoring (*see Standards for Educational and Psychological Testing,* APA, 1999)."  and Exhibit E Specialty Guidelines for Forensic Psychology (APA), page 16:  Guideline 10.06: Documentation and Compilation of Data Considered "Forensic practitioners are encouraged to recognize the importance of documenting all data they consider with enough detail and quality to allow for reasonable judicial scrutiny and adequate discovery by all parties.  and ll:0411.04 of this publication makes it clear that when authoring a report the expert must "strive to offer a complete statement of all relevant opinions that they formed…the basis and reasoning underlying the opinions, the salient data or other information that was considered in forming  the opinions…"
[7] Exhibit B Dr. Tannahill Glen Report on 10/7/l4, page 5.  Dr. Glen refers to "another validity scale" not "scales" plural indicating over reporting.
[8] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015,  page/line l54-55/25, 1-10 (somatic fbs) and page/line 170/l5-24, l36/l8.

document she produced per the Court Order her response was, "I can't remember who authored that."  See Exhibit I.[9]

10. She produced only portions of some test administration and interpretation manuals versus the entire manual.  Thus depriving the undersigned of context or the ability to research further whether material in the manual supported her conclusions. The undersigned is and was not able to order the entire manuals themselves as the test publisher refuses to sell them to anyone, other than psychologists. See Exhibit G.[10]

11. Dr. Glen, now for the first time in her deposition, produced new publications she relied upon in reaching her conclusions which violates this Court's Order. See Exhibit C.  At the deposition, she for the first time produced a new reference which she relied on to score a test of effort known as the Test of Memory Malingering ("TOMM").  This is presumably because she realized the actual TOMMs manual published by the creator of the test indicated Plaintiff's scores were within the *non malingered* range.  She referred to the new reference *Traumatic Brain Injury* to support her reliance and methods however, this case does not involve a traumatic brain injury.  This book was not produced to the Plaintiff per Court Order.  See Exhibit I.[11]

12. Dr. Glen claimed a test called the Reliable Digit Span supports poor effort on the part of the Plaintiff.  Her deposition revealed another violation of the Court Order. "I don't

---

[9] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 122/22.

[10] Exhibit G Pearson Qualifications Policy Qualification Levels.

[11] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 93/2l – 25, page/line 100/1-6, page/line , page /line l00/1-7 wherein when asked what manual or publication indicates a score of getting 96% correct is evidence of poor effort she then refers to the book on Traumatic Brain Damage and admits on the same page it was not factored into her report but she refers to it as supporting her interpretation.101-02/1-25, 1-3 and pages 109 and 111.

see the RDS article in what I gave you offhand which is why I brought this extra book today as a reference."  See Exhibit I.[12]

13. As to those articles and manuals she did produce prior to the deposition, she only produced a page or two from an article, and the same is true with test manuals.  In other words, Dr. Glen failed to produce entire articles or manuals thus making it impossible to understand the context or references supporting her opinions.  See Exhibit I.[13]

14. As to another article regarding her methodology in scoring "I guess I don't have the whole article…I don't own the whole article…"  See Exhibit I.[14]

15. In her deposition, Dr. Glen testified that she relied on a scale called the Response Bias Scale, even though she produced no validated published administration and interpretation manual, because none existed.  However, when asked about an article identifying the items and asked about the manual she admits none exists and claims to rely on one page from an article. She admits the article does not even list what the items are that make up the RBS and the test items were to have previously been produced.  See Exhibit C.[15]  Her explanation was "well, again I just saw this the other day."  This clearly indicates this new method of interpretation which was not considered in her report nor produced previously as required by law. She then testified,

---

[12] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 271/9-20.

[13] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 47/15, "…I don't have the whole article…" See also page/line 48/10.  "…how many pages was the article?  A: I don't know."

[14] Exhibit I l8l/8-9,15-16

[15] Exhibit C Court Order on Exam 9-11-2014.

"I don't think I have access to that journal…."  See Exhibit I.[16]  This is not in compliance with this Court's Order.  If she is relying on a portion of a journal she does not have access to, then not only did she fail to comply with this Court's Order, but she is depriving the undersigned of any meaningful cross examination as to the entire document.

**As to the Test of Memory Malingering ("TOMMS"):**

16. TOMMS is a test wherein an individual is asked to remember 50 images and is then questioned about them later.  Dr. Glen admitted the patient got 96% of the answers correct in trial II of this measure.

17. She claimed, however, this was evidence of "insufficient effort" in spite of the fact he got almost every single answer c*orrect*.  See Exhibit I.[17]

18. This is similar to a child taking a test and scores 96% correct and the teacher *flunks* the student and concludes that the student was not trying hard enough.  Not only is this unscientific, it is contrary to logic.

19. This is especially true when Dr. Glen admitted in her deposition that the manual published by the creators of the test she administered indicated the client's scores were *not in the malingered range*.  See Exhibit I.[18]

---

[16] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line, 228/20-23, 231/22-232/11, and 232/16-23

[17] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 100/1-6 and 93/19-25. (His got 48 out of 50 correct in trial II and the manual suggests malingering may be a problem if individuals get 45 or less correct).

[18] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 100/1-6 and 93/19-25(His got 48 out of 50 correct in trial II and the manual suggests malingering may be a problem if individuals get 45 or less correct).

20. This is made even more offensive by the fact that she failed to produce the new book upon which she was now relying to reach her conclusions in direct contradiction to this Court's Order as discussed previously.

**As to the Reliable Digit Span ("RDS"):**

21. Dr. Glen also concludes poor effort based on something called the "Reliable Digit Span" See Exhibit I. [19]

22. She produced no test publisher's manual setting forth the standards for administering and scoring such a measure.

23. She admitted the test upon which this was based was not created as a malingering test but actually part of an IQ test.  See Exhibit I.[20]

24. She admits she relied upon this interpretation based upon an article not produced prior to the deposition in violation of this Court's Order.  As to the RDS scale, she testifies,"...you know the cutoff in your head" and it is exactly this kind of fraudulent methodology that *Daubert* addresses.  See Exhibit I.[21]

25. She admits the interpretation manual for this measure does not suggest that a poor scale means malingering. See Exhibit I.[22]

26. Therefore, she continues to use tests in a manner contrary that what they were created.

**As to the California Verbal Learning Test ("CVLT"):**

---

[19] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 256/7-l8.
[20] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 261, 269/l-3, 19-2l.
[21] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 271/20-21.
[22] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 269/l-4

27. Dr. Glen administers this test to conclude the patient is giving poor effort. When she was asked to admit that the interpretation manual reflected no such thing as to her methodology, first she avoided the question but then ultimately admitted the manual did not support her methodology.  See Exhibit I.[23]

28. She further admitted when pressed that the interpretation manual for this measure shows the Plaintiff got a *perfect score* on the scale designed to determine exaggeration. See Exhibit I.[24]  She in fact admitted in other cases when someone does poor on this particular scale in which the plaintiff got a perfect score she has opined it was an indication of poor effort.  See Exhibit I.[25]  This was left out of her report.  However, she ignores the instructions set forth by the publishers of this test on how to interpret the results and becomes vague and creative.

**As to Rey Complex Figure Drawing:**

29. She does the same thing with the Rey Complex figure drawing.  Although the Plaintiff is taking medications which are known to cause concentration problems as admitted by Dr. Glen, the fact that Plaintiff did poorly when trying to copy a figure and remember the elements of the drawing meant he was malingering or intentionally trying to do poorly.  However, she admitted this test was not created as a malingering test and there was nothing in the manual for this test that suggested such an interpretation.  See Exhibit I.[26]

---

[23] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 266-77/l-25, 1.
[24] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 262/l7-25, 263, and 264/l-l4.
[25] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 263/5-8.
[26] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 255/1-256/25, 1-9.

30. A review of the material provided does not seem to indicate this expert produced a scoring mechanism on this assessment supporting her conclusion it means malingering.

**As to the MMPI2:**

31. Dr. Glen administered the MMPI2 and testified the results supported malingering. The MMPI2 is a questionnaire consisting of 567 questions to which the patient answers "true" or "false" to the items.  See Exhibit I.[27] These statements do not rule out a medical condition and consist of true or false questions like "I like mechanics magazines."  See Exhibit I.[28]

32. However, Dr. Glen seeks to use certain articles which suggests new "scales" which conclude if a patient answers certain questions on this test it means malingering. Specifically what is referred to as the "Henry-Heilbronner Index, the Fake Bad Scale and the Response Bias Scale (RBS) which consists of looking at the patient's answers to certain items on the MMPI2 and presuming they support exaggeration.

33. This reliance is unscientific as follows:

34. Dr. James N. Butcher, one of the creators of the MMPI2 and creator of the software Dr. Glen used to score the test has opined her methods were misleading, false and contrary to the actual results of the test as follows (see Exhibit A)[29]:

[27] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 73/14-17.
[28] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line l54/2l-22.
[29] Exhibit A James N Butcher Affidavit 6-15-2015.

9

35. Dr. Glen's report is misleading as it reports test results indicate on only "mild" depression and anxiety.  In fact, the actual scores on the MMPI2 fall in the "high" range of depression and "moderate" range of anxiety.

36. Dr. Butcher points out in his affidavit that Dr. Glen seeks to avoid any reliance on well reasoned test administration and interpretation manual.  When the Plaintiff passes the "malingering" scales in tests such as the MMPI2, Dr. Glen ignored the instructions in the publisher's manual and concluded the results showed exaggeration anyway.  As Dr. Butcher explained in his affidavit, published test manuals must undergo far more rigorous standards than a single published article and as such are inherently more reliable.  Quoting from a one page of an article, or even an entire article does not result in the conclusion that the well respected and independently validated tests manuals should be ignored.

37. Dr. Butcher points out that Dr. Glen's report discussing the MMPI2 is incomplete and fails to properly set forth minimum reporting requirements when giving the MMPI2.  Dr. Butcher is the expert in this field because he created the MMPI2, created the software Dr. Glen used and has taught others how to report and interpret the results for decades.  Dr. Butcher opines Dr. Glen fails to provide any test or scale upon which she is relying that the patient is malingering nor did she provide any scores, which is entirely inappropriate.

38. According to Dr. Butcher, the MMPI2 results, contrary to Dr. Glen's claim, do not support the conclusion Mr. Hairston is malingering.  In fact, he passed all of the validity scales in the entire MMPI2 printout.  This was left out of Dr. Glen's report.

10

39. Dr. Glen attempted to apply new scales not recognized by the creators of the MMPI2.

40. Unlike the MMPI2, these new scales have not been evaluated or tested by the nationally known independent Buros Testing Center which has validated the MMPI2.

41. Dr. Glen, in fact, in reaching her conclusions completely ignored the results of the validity scales in the MMPI2 which conclude the Plaintiff is not malingering.

42. This violates the APA Standards for test interpretation which specifically advise the psychologist to administer and interpret the manual in accordance with the test publisher's instructions. See Exhibit F.[30]

43. Dr. Glen failed to admit her unusual methods in her report, such that any meaningful preparation could occur to conduct discovery or understand her methodology.

44. As to the alleged science behind her claims MMPI2 "new" scales support exaggeration or somatic symptom reporting include:

**As to the Fake Bad Scale ("FBS"):**

45. Dr. Glen relied in part upon the FBS, wherein she indicated it was a "red flag" for over endorsement of symptoms. See Exhibit I.[31]

46. As reflected in Dr. Butcher's affidavit, this scale was first introduced in a journal that was highly questionable; the articles were published not based on the legitimacy of the science or peer review but whether the author paid the journal to publish his article. This is profoundly unreliable. See Exhibit I.[32]

---

[30] Exhibit F Standards for Educational and Psychological Testing (APA 1999), page 6l.
[31] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 139/2.
[32] Exhibit A James N Butcher June 15, 2015

47. Dr. Glen, in fact, also failed to produce any test administration or interpretation manuals as to the FBS, nor did she identify in her material the items that made up this scale.  See Exhibit I.[33]  Again, she directly violating this Court's Order.

48. The patient scored a 22 on this scale.  Contrary to Dr. Glen's claim, the publisher of this scale has indicated this score is not within the malingered range.  See Exhibit I.[34]

49. This scale is invalid for the reasons set forth in Dr. Butcher's affidavit.  A review of this "scale" indicates the author suggest a patient should be found to be malingering when honestly admitting to the very symptoms he has.

50. Therefore, as with all other scales upon which she relied, Dr. Glen produced no standardized test administration or interpretation manual confirming that her methodologies and/or conclusions were correct.  More importantly, in this scale as with others, she produced no publication in her material that these scales should be used in place of the actual accepted validity scales interpreted by the MMPI2 software.  Perhaps that explains why multiple courts across the nation acting as gatekeeper and precluding the scale from being admitted into evidence.  See Exhibit H.[35]

**As to the Henry-Heilbronner Index ("HHI"):**

---

[33] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 136/10-20 where she admits she did not bring a scoring manual for the Fake Bad Scale

[34] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 139-140/24-25, 1-9.

[35] Exhibit H FBS Orders (Davidson v. Strawberry Petroleum, Inc et al, 6-14-2007; Anderson v. E&S International Enterprises 7-30-2008; Stith v. Williams, et al 8-8-2008; Vandersgracht v. Progressive, et al 3-9-2005; Williams v. CSX Transportation 9-19-2007; Kirker v. Dicosta 2-10-2009; Rodriguez v. Millercoors, LLC 9-25-2012). Includes the Rodriguez court references wherein the defense withdrew his reliance on the MMPI2 after objection was made to the FBS.

51. Dr. Glen testified her conclusions of exaggeration were based upon answers to a scale or index known as the Heilbronner Index as applied to the MMPI2.

52. Dr. Butcher's affidavit sets forth the reason <u>his test</u> (MMPI2) should not be used by applying this scale.

53. Dr. Glen admitted the documents which she claims make up the Heilbronner scale do not come from any published document.  They are merely numbers written down on a piece of paper, and she admitted she did not even know where they came from.  Dr. Glen was asked, "…so you don't know where… you got the list of items that make up the Henry-Heilbronner scale?" Dr. Glen testified, "Yeah. I can't remember if it's part of the actual article."  See Exhibit I.[36]  The only publication she produced on this "scale" indicated one had to contact the author to obtain the items.

54. Further, to actually get the statements that make up the "scale" it would be necessary to contact the author directly (see Exhibit I),[37] thus making it impossible to satisfy *Daubert* since the items are published in no book, journal or article so as to be verified and assessed.

55. She further admitted she produced no standardized administration or interpretation manual published by the publisher of the MMPI2 on how to score the HHI scale.  This is because it does exist and as such fails *Daubert*.

---

[36] Exhibit I Dr. Glen depo Page l83 9-16 and l86/l7.
[37] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 187/14-17.

13

56. When referencing publications on HHI, Dr. Glen was asked, "Well, where is the publication…" Dr. Glen testified, "I don't own the whole article. I have the reference." See Exhibit I.[38]

57. No administration and interpretation manual as to this test or scale was produced such that she could be questioned as to standards for administration or interpretation.  This is because they do not exist.

58. The index consists of fifteen statements taken from the MMPI-2, a 567 item inventory to which the patient answers "true" or "false."  The Heilbronner Index is based upon an article wherein the author decided if someone answered true to some items from the MMPI2 and false to others, it meant malingering in spite of the fact that every single answer may be true.

59. A review of the scale reflects individuals get points for malingering when, in fact, they are admitting to legitimate symptoms of pain and side effects of medications.

60. Pearson Assessments, the publisher of the MMPI-2 from which the HHI is taken offers computerized scoring of the test and various scales.  The publisher does not include the HHI as one of its scored or interpreted scales or indexes.  See Exhibit A.[39]

61. Furthermore, as indicated in Dr. Butcher's affidavit, the independent body which conducts assessment on scientific validity of test instruments, known as Buros Testing Center, has not yet evaluated the FBS, or the RBS or Heilbronner for that matter. Although Dr. Arnie Ables, chair of APA Committee of Issues on Disability and

---

[38] Exhibit I Page l8l line 12-l5
[39] Exhibit A James N Butcher Affidavit 6-15-2015.

Psychology, specifically requested the FBS upon which the bulk of the HHI is based, undergo such rigorous objective evaluation due to the fact the scale has the potential to call those who are disabled as fakers.  See Exhibit J.[40]

**Response Bias Scale, ("RBS"):**

62. Dr. Glen was asked if the Plaintiff's level of responses on the RBS indicated malingering and her response was that this scale is a validity scale "very sensitive to malingering…"  See Exhibit I.[41]

63.  If it is not a test instrument and has no published standardized test administration and interpretation manual then it is not scientifically reproducible and fails *Daubert* discussed below. Dr. Glen testified "I don't know if it's listed in the article. Yeah. Sorry. That's the response bias. It has it --I don't have the article. I have -- yeah. I just want to make sure I'm giving you the right thing. The -- so this is just a reference page for it. I guess I don't have the whole article. So I have the reference page and then a list that I've had for years of what the items are. "  See Exhibit I.[42]

64. Dr. Glen in direct contradiction to this Court's Order failed to bring any published interpretive manual from any publisher setting forth the requirements to administer and interpret the scales.

65. She admitted that the scale did not factor into the report she wrote, meaning it is now a new opinion which was not disclosed until her deposition.   See Exhibit I.[43]

---

[40] Exhibit J Letters to the American Psychological Association (APA)
[41] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 222/3-ll.
[42] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 181/4-l6.
[43] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 2l5/1-25.

Therefore, this new scale was not a part of the conclusions in her report which was supposed to contain her opinions.

66. She admits for example, the Plaintiff would get a point on this so called exaggeration scale  saying true to the question "I believe I am being followed" even though, in this case, he clearly was and she was provided with the surveillance.  See Exhibit I.[44]

67. Dr. Glen also testified that she was not an expert in administering or interpreting functional capacities assessment (FCE) conducted by Tara Marchand but the FCE results were another reason she believed the Plaintiff was malingering.  See Exhibit I.[45]

68. On that same day, the therapist who administered the FCE testified and admitted the purpose of the FCE results were *not* to be used to determine malingering or intentional exaggeration.  See Exhibit K.[46]

69. Dr. Glen is not trained or authorized to practice medicine; perform a medical exam; write prescriptions; order scans; interpret scans; perform surgery; treat or diagnose the physical conditions suffered by the Plaintiff; draw blood; or give injections.

70. Dr. Glen has not performed a physical examination of the Plaintiff.

71. Dr. Glen is not trained or licensed to render an opinion as to the Plaintiff's location of pain; duration of pain; frequency of pain; and/or type of pain.

72. As such, Dr. Glen cannot offer testimony that the Plaintiff's physical condition is not real or that the Plaintiff's pain is exaggerated, faked, or malingered.

[44] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 230/l3.
[45] Exhibit I Deposition of Dr. Tannahill Glen, in Hairston v. Ed Nelson, 6-11-2015, page/line 38/l2 and 4l-42/2l-25, 1-25.
[46] Exhibit K Deposition of Tara Marchand in Hairston v. Ed Transportation 6-11-2015, page/line 40/23.

73. Dr. Glen cannot, therefore, opine the physical symptoms she cannot diagnose are psychological in nature and constitute a Somatic Symptom Disorder as opposed to being due to very real physical conditions diagnosed by multiple medical doctors.

74. Dr. Glen cannot determine the date the Plaintiff allegedly began to fake his symptoms; which specific symptom was faked (i.e. neck pain); the degree to which it was faked; the frequency to which it was faked; the location of the faked pain; the propensity to fake in the future; and/or the symptoms expected based on his condition.

75. There are no standards set forth by Dr. Glen for which tests to administer, how many to administer and how to interpret the "malingering" tests.  This is clear because Dr. Glen administered a number of malingering tests which the Plaintiff passed.  When he continued to pass them she then apparently decided to ignore the test manuals and interpret them as flunking anyway.

76. There is no agreed upon professional standards as to the correct number, in what order and in what context as to the administration of "malingering" tests.  There is no generally accepted method of determining, for example, what to do if the patient passes three out of six malingering tests.

77. Since Dr. Glen did not conduct a physical exam, which she is not trained to do so, she cannot opine that the symptoms exceed the various diagnoses because to do so she would be engaging in the unauthorized practice of medicine.  However, that is exactly what malingering tests seek to do.  The tests seek to give the tester permission to brand the Plaintiff as a faker of symptoms of a condition the tester has not evaluated because he/she is not a medical doctor.

17

## MEMORANDUM OF LAW

### I.    Dr. Glen's Testimony Fails the Daubert Standard

Dr. Glen's Testimony fails under the standards set forth in *Daubert*.   Under the *Daubert* standard, "courts must act as "gatekeepers" that admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova*, 400 F.3d 1286, 1291 (11th Cir. 2005). "The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" See Fed. R. Evid. 702, citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Courts are charged with ensuring "that speculative, unreliable expert  testimony does not reach the jury under the mantle of reliability that accompanies the appellation "expert testimony." *Rink* at 1292.

"The admission of expert evidence is governed by Fed. R. Evid. 702, as explained by *Daubert* and its progeny." *Daubert* 590 U.S. at 592. "Rule 702 provides that a witness  qualified as an expert by knowledge, skill, experience, training, or education may provide expert  testimony only if (1) the testimony is based on sufficient facts or data, (2) the testimony is the  product of reliable principles and methods and (3) the witness has applied the principles reliable  to the facts of the case." *See Coconut Key Homeowners Ass'n, Inc. v. Lexington Ins. Co.*, 649 F.  Supp. 2d 1363, 1370-71 (S.D. Fla. 2009); Fed. R. Evid. 702. "To fulfill their obligation under *Daubert*, district courts must engage in a rigorous inquiry to determine whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the  testimony assists the trier of fact, through the application of scientific, technical, or

specialized expertise, to understand the evidence or to determine a fact in issue." *Rink*, 400 F.3d at 1291-92. "The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." *Id.* at 1292.

In evaluating reliability, district courts are required to assess "whether the reasoning or methodology underlying the expert testimony is scientifically valid." *Daubert*, 509 U.S. at 592. Evaluating the reliability element "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning and/or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. "In ascertaining reliability under the second *Daubert* prong, we have identified several factors which can be considered: (1) whether the expert's methodology can be tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method has a known rate of error; (4) whether the technique is generally accepted by the scientific community." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005). In this case, Dr. Glen ignores standardized testing administration and interpretation manuals published by the creators of the tests. Instead, Dr. Glen relies upon a page or sentence from part of an article. Dr. Glen cannot produce evidence or support why standardized and well validated test administration and interpretation manuals should be ignored in favor of a single article, when commenting on something so prejudicial and unscientific as the ability to determine if someone is lying.

Other factors to be considered include: (1) whether "the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion," and consequently "there is simply too great an analytical gap between the data and the opinion proffered"; (2) whether

"the expert has adequately accounted for obvious alternative explanations"; and (3) whether the "field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give." *See* Fed. R. Evid. 702 (comments); *Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167, 1176 (1999).

## II. Dr. Glen Is Unqualified As an Expert

Dr. Glen is not qualified to render any expert medical opinions as to the location, frequency, duration and intensity of symptoms of the medical conditions suffered by the Plaintiff by her own admission. She is a psychologist and not a medical doctor. Therefore, it is equally improper for her to opine the physical symptoms experienced by the plaintiff are exaggerated or faked.

Dr. Glen's testimony is essentially that she cannot tell us what symptoms the Plaintiff should have based on his physical injuries; she cannot tell us what symptom he is experiencing; she cannot tell us what symptoms he is exaggerated; and she cannot tell us which specific times on any test, index or scale are exaggerated.

Therefore, she is surely not an expert on the very topic upon which she reports or testifies. Psychological testing involves comparing the responses from the Plaintiff and others thought to be depressed, anxious, etc. Conclusions are drawn from such "psychological profiling" but in no way provide concrete evidence as to how the Plaintiff is feeling. Psychology is not specific to the individual such as a blood test or MRI of the spine.

Since Dr. Glen lacks specialized knowledge in diagnosis, treatment, and symptoms of the Plaintiff's physical condition, she is unqualified to render expert opinions that his symptoms from those conditions are faked or exaggerated. *See Coconut Key Homeowners*

*Ass'n, Inc. v. Lexington Ins. Co*., 649 F. Supp. 2d 1363, 1371 (S.D. Fla. 2009) (striking expert's opinions as he "lacks both the expertise and reliable underlying data needed to provide expert testimony about either wind speeds at Coconut Key during Hurricane Wilma or the cause of the damages he has observed there"); *Medina v. Louisville Ladder, Inc.,* 496 F. Supp. 2d 1324, 1328 (M.D. Fla. 2007) (excluding mechanical engineer for lack of qualification on warning issues). This is true even where the expert has some limited experience with the general subject matter at issue in the case. *Graff v. Baja Marine Corp*., 310 Fed. Appx. 298, 304 (11th Cir. 2009) (excluding metallurgist with limited aluminum expertise at issue in that case).

Even if Dr. Glen has some experience referring patients to orthopedic physicians for physical conditions, she does not qualify as an expert and cannot opine on legitimacy of his symptoms. *See Bell v. Okuwobi*, 2006 WL 692457 (M.D. Ga. 2006) (prison physician was unqualified to testify as expert about hepatitis C treatment notwithstanding his prior experience treating patients with condition). In *Beam*, the Court applied the *Daubert* standard to exclude a mechanical engineer as unqualified to opine on defective design of a garbage truck, notwithstanding that engineer's extensive knowledge of product defects, guard designs, warnings, and other issues relevant to that case, due to his lack of particularized experience with garbage trucks. *See Beam v. McNeilus Trauck & Mfg., Inc*., 697 F. Supp. 2d 1267, 1272 (N.D. Ala. 2010).  Similarly, the qualification standard has been applied to hold that a general physician was unqualified to opine on toxicology issues, and a maxillofacial surgeon qualified to opine on the cause of osteonecrosis, although it occurred in a jaw. *See Everett v. Georgia-Pac. Corp*., 949 F. Supp. 856, 858 (S.D. Ga. 1996) (physician unqualified on toxicology);

*Harvey v. Novartis Pharm. Corp.*, 895 F. Supp. 2d 1206, 1211 (N.D. Ala. 2012) (maxillofacial surgeon unqualified on osteonecrosis). In this case, Dr. Glen's lack of any causation, orthopedic, neurology, or other qualifications supports exclusion of her unsupported expert opinions.

### III. Dr. Glen's Unsupported Opinions Lack Foundation and Reliable Methods and Principles

At no time does the psychologist actually "know" what the patient is thinking when the tests are administered.   In fact, the "malingering" or "effort" tests are the weakest of all psychological tests.  The reason is because there is no publication which actually independently validates these tests on *actual* malingerers.  That is to say, they have never been verified on populations in law suits who have later been found to have been objectively documented to have malingered their symptoms by admission or any other objective proof.  Perhaps Judge Matsch, when presented with one of these so called "malingering tests" stated "I mean, you know, there's science in this but psychiatry is pseudoscience, you know.  There is no empirical testing that you can use for what psychiatrists do or psychologists."  See Exhibit H.[47]

If the expert has no manuals which set forth standardized methods for administering and scoring a measure or test, or if the expert ignores those manuals that do exist, it has the great potential for there to be: no standards for  how the measures should be consistently administered and under what circumstances it should be administered; what criteria exists

---

[47] Exhibit H, See Rodriguez v Millercoors, LLC decision contained within the Fake Bad Orders exhibit H wherein the Fake Bad Scale was discussed Page l2, lines l5-l8.

under which to score the measure; what scoring standards are utilized; and how the scores should be interpreted based upon the facts in the case.

Lack of proof that something has been adequately tested, subjected to peer review, and a lack of a known error rate renders testimony inadmissible. *Hendrix v. Evenflo Co*., 255 F.R.D. 568, 599-600 (N.D. Fla. 2009). The lack of a known error rate when comparing multiple variables renders an expert's testimony speculative and inadmissible. *See Brown v. Burlington Northern Santa Fe. Ry.*, 765 F.3d 765, 774 (7th Cir. 2014). There is literally no article whatsoever which determines how anyone would respond to any of the tests given by Dr. Glen when the patient was not malingering but was suffering from a herniated lumbar disc; suffering from multiple herniated discs in the cervical spine; had one surgery in the cervical spine; had carpal tunnel syndrome objectively diagnosed by electrodiagnostic studies; and had passed standard "malingering" scales according to the publishers of the test. Methodological errors resulting in and including an unknown error rate render testimony speculative and inadmissible. *KW Plastics v. United States Can. Co.*, 131 F. Supp. 2d 1289,1294 (M.D. Ala. 2001).

To the extent Defendants argue that this is not grounds for preclusion but rather, a matter as to the weight that a jury may give to Dr. Glen's opinions, before a jury can even assess the credibility of an expert's opinion, there has to be a sufficient foundation upon which the expert's opinion is premised upon.

Dr. Glen's conclusory opinions are unsupported. Dr. Glen's opinion is premised solely on tests that are not scientific and reproducible. Her testimony is most assuredly not the product of reliable principles and methods.  Her methods are vague, contrary to test manuals and in direct

opposition to the conclusions of one of the creators of the very test she gave. See Dr. Butcher's Affidavit.

## CONCLUSION

**WHEREFORE**, the Plaintiff respectfully requests this Honorable Court to strike Defendant's Expert Witness, Dr. Tannahill Glen.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Civil Procedure Rule 26 and Local Rule 3.01(g), undersigned certifies that he has conferred with Defense counsel and made a good faith effort to resolve this dispute without Court action.

 s/ Fraz Ahmed
Attorney

LAW OFFICES OF ERIC S. BLOCK, P.A.

s/ Fraz Ahmed
**ERIC S. BLOCK**
Florida Bar No.: 0915531
FRAZ AHMED
Florida Bar No.: 0025653
6817 Southpoint Parkway, Ste. 2502
Jacksonville, Florida 32216
TEL.: (904) 475-9400
FAX: (904) 475-9411
Attorneys for Plaintiff
Primary email: eservice@ericblocklaw.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing has been furnished via electronic delivery to Ellis T. Fernandez, III, Esquire, et@fernandeztl.com; emy@fernandeztl.com; Pleadings@Fernandeztl.com and Sorena Fallin, Esquire, Pleadings@Fernandeztl.com; Sorena@Fernandeztl.com at 8780 Perimeter Park Court, Bldg 200, Jacksonville, FL 32216, Counsel for Defendants; and Christopher Johns, Esquire, Zachary Von Roenn, Esquire, Johns & Von Roenn, 4901 Atlantic Blvd., Jacksonville, FL 32207, zvonroenn@chrisjohnslaw.com, cjjaxlaw@yahoo.com; Counsel for Plaintiff, for this 15th day of June, 2015.


 s/ Fraz Ahmed
Attorney