# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

**ANTHONY HAIRSTON,**

**CASE NO.: 3:13-cv-1457-J-32BT**

        **Plaintiff,**

    **vs.**

**ED NELSON TRANSPORT,**
**a Foreign Profit Corporation and**
**ED NELSON, Individually,**

        **Defendants.**

_____/

## DEFENDANTS' NOTICE OF FILING DEPOSITION TRANSCRIPT

Defendants, **ED NELSON TRANSPORT and ED NELSON,** by and through their undersigned attorney, hereby give Notice of Filing the deposition transcript of David L. Dorrity, MHRD, CDC, CDT taken on Thursday, May 14, 2015, in the above styled cause to the United States District Court for the Middle District of Florida, Jacksonville Division. A true and correct copy of the deposition transcript with exhibits is attached hereto as Exhibit "A".

*(Certificate of Service on the Following Page)*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via Electronic Mail to Chris Johns, Esq. and Zachary Von Roenn, Esq. via zvonroenn@chrisjohnslaw.com; epleading@chrisjohnslaw.com and Eric S. Block, Esq. and Fraz Ahmed, Esq. via eservice@ericblocklaw.com, on this 25th day of June, 2015.

**FERNANDEZ TRIAL LAWYERS, P.A.**

*/s/ Sorena S. Fallin*
**E.T. FERNANDEZ, III, ESQUIRE**
Florida Bar No. 371556
**SORENA S. FALLIN, ESQUIRE**
Florida Bar No. 0019102
8780-200 Perimeter Park Court
Jacksonville, Florida 32216
(904) 398-8008 (Phone)
(904) 398-0332 (Fax)
Attorneys for Defendants

*The following e-mail addresses are only for e-mail service pursuant to Fla. R. Civ. Pro. 1.080:*
Primary: Pleadings@Fernandeztl.com
Secondary: Sorena@Fernandeztl.com

Exhibit "A"

---

**Page 1**

First Choice Reporting & Video Services

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CASE NO.: 3:13-cv-01457-J-32JBT

ANTHONY HAIRSTON,

Plaintiff,

vs.

ED NELSON TRANSPORT,
a Foreign Profit Corporation
and ED NELSON, individually,

Defendants.

---

DEPOSITION OF DAVID L. DORRITY, MHRD, CDS, CDT

---

| | |
|---|---|
| DATE TAKEN: | Thursday, May 14, 2015 |
| TIME BEGAN: | 10:10 a.m. |
| TIME ENDED: | 1:30 p.m. |
| LOCATION: | Huseby/Greenville |
| | Merovan Office Suites |
| | 1200 Woodruff Road, Building A-3 |
| | Greenville, South Carolina  29607 |

REPORTED BY:      Elaine L. Grove-DeFreitas, RPR

www.firstchoicereporting.com      Worldwide Scheduling      800.939.0093

---

**Page 3**

First Choice Reporting & Video Services

INDEX

| | PAGE |
|---|---|
| Examination by Mr. Gambler................... | 4 |
| Examination by Mr. Ahmed.................... | 78 |
| Reexamination by Mr. Gambler.............. | 87 |
| Reexamination by Mr. Ahmed.................. | 92 |
| Certificate.............................. | 96 |
| Exhibits:  (Attached To Deposition) | |
| Exhibit 1 (8-11-14 Handwritten Notes)....... | 32 |
| Exhibit 2 (8-11 Handwritten Notes).......... | 33 |
| Exhibit 3 (8-20-14 Handwritten Notes From Site Visit)................................... | 35 |
| Exhibit 4 (Fee Schedule Contract)........... | 35 |

www.firstchoicereporting.com      Worldwide Scheduling      800.939.0093

---

**Page 2**

First Choice Reporting & Video Services

APPEARANCES

FRAZ AHMED, ESQUIRE
Law Offices of Eric S. Block, PLLC
6817 Southpoint Parkway
Suite 2502
Jacksonville, Florida  32216
Ph:   904-475-9400
Email: fahmed@ericblocklaw.com
      ..... On Behalf of the Plaintiff

NEAL GAMBLER, ESQUIRE
Fernandez Trial Lawyers, P.A.
8780-200 Perimeter Park Court
Jacksonville, Florida  32216
Ph:   904-398-8008
Email: Sorena@Fernandeztl.com
      ..... On Behalf of the Defendant

NONWAIVER:  Examination and reading of the
deposition are not waived by the witness and
by the parties.

www.firstchoicereporting.com      Worldwide Scheduling      800.939.0093

---

**Page 4**

First Choice Reporting & Video Services

1  DAVID L. DORRITY, MHRD, CDS, CDT, having been duly
2  sworn, testified as follows:
3                    EXAMINATION
4  BY MR. GAMBLER:
5      Q    Please state your name for the record.
6      A    David L. Dorrity.
7      Q    And your professional address, please.
8      A    Transportation Resources,
9                 , South Carolina 29615.
10     Q    And the Transportation Resources, is that
11  your company?
12     A    It is.
13     Q    And how long have you owned that company?
14     A    1992.
15     Q    Okay.  And what is the nature of that
16  business?
17     A    The company has changed over time.
18  Initially it was organized to provide regulatory
19  compliance permitting, tax preparation and safety
20  consultation to the trucking and charter bus
21  industry.  Over time we dropped some services, added
22  some services.  One of the services that was added
23  eventually, as I became personally involved in
24  litigation support or forensic type work like we are
25  doing today, that work began, in a small part, in

www.firstchoicereporting.com      Worldwide Scheduling      800.939.0093

---

First Choice Reporting & Video Services

Page 5

```
1    1995.  And I significantly picked up in the early
2    2000s to today.  In fact, as of last year
3    Transportation Resources has curtailed its
4    consultation to the general industry, the trucking
5    industry.  We occasionally will field some old
6    customers with advice and spotted-type consultation,
7    but we no longer have any clients on regular
8    retainer.
9         So beginning in 2015 my work is, with the
10   exception of a little bit of teaching here and
11   there, exclusively involved in the litigation,
12   forensic world.
13        Q.   Okay.  And were you retained with regards
14   to the current matter involving Mr. Anthony
15   Hairston?
16        A.   I was.
17        Q.   And when were you retained?
18        A.   August of 2014.
19        Q.   And by whom were you retained?
20        A.   Initially, I was retained by Zach Von
21   Roenn, or Roenn.  That's V-O-N and then another word
22   R-O-E-N-N.
23        MR. AHMED:  You did get it right the second
24   time.  Just for the record, we are co-counsel on the
25   case.
```

---

First Choice Reporting & Video Services

Page 6

```
1    WITNESS CONTINUES:
2         A.   And I think I either talked with Eric
3    Block at the time, maybe over a phonecall, some kind
4    of conference call, and then later I think Fraz,
5    maybe, and I conversations.  But it was around
6    August 2014, because it was shortly after our
7    initial conference that I made a visit to
8    Jacksonville, to the scene.
9         Q.   Okay.  And what was the purpose of your
10   retention?
11        A.   To evaluate the performance of the truck
12   driver in this accident.
13        Q.   And the initial contact, do you know if
14   that was by phone, letter, e-mail?
15        A.   It was by phone.
16        Q.   Okay.  Do you know approximately how long
17   that conversation lasted?
18        A.   I don't.  I don't have a feel for how long
19   the call lasted.
20        Q.   Okay.  And with regards to that telephone
21   conference, you had indicated at some point that
22   Mr. Block was also on a call.  Do you know if he was
23   on that specific call?
24        A.   It is my recollection that there was a
25   conference call.  I don't know if it was on the
```

---

First Choice Reporting & Video Services

Page 7

```
1    initial call, but there was a conference call at
2    some point, I recollect, and it was a three-way
3    party call.
4         Q.   So that would have been with you, Mr. Von
5    Roenn and Mr. Block?
6         A.   Yes.
7         Q.   Okay.  And with regards to that call what,
8    exactly, was discussed?
9         A.   Well, the first thing that I can vaguely
10   remember in the conversation was them inquiring
11   about my expertise and my areas of work.  I assume
12   they were referred to me by someone, but I don't
13   know who that would be.  I told them about my
14   background in the trucking industry and teaching and
15   advising in safety issues regarding driver
16   performance, and then they described their accident.
17        And I suppose, I don't remember exactly,
18   they asked if I could help them, at least initially,
19   in evaluating the documentation they had, a few
20   depositions.  And it may have been during that
21   conversation I would need to see the scene.
22        I don't always need to see an accident
23   scene, because I do deal, in large part, with motor
24   vehicle crashes.  And in those cases, typically
25   there will be a mechanical engineer, an accident
```

---

First Choice Reporting & Video Services

Page 8

```
1    reconstructionist that's involved, and I don't need
2    to see the scene.  Generally, photos do the job for
3    me.  This, however, was a unique accident, in that
4    it involved not only a backing accident, but it
5    involved backing inside of a building.  So for that
6    reason and that reason only, I felt like I needed to
7    see the location.
8         Q.   Okay.  Now, with regards to discussion
9    regarding your expertise and qualifications, I'm
10   assuming that you have done this for a while and you
11   probably have a spiel that you use.  I know I do,
12   I'm sure Fraz does.  How would that go?
13        A.   Well, responding to your question about my
14   spiel, I have just about dispensed with that,
15   because you have to understand, they were calling
16   me.  I tell them about my background.  I suppose --
17   I don't want to make more of myself than I should,
18   but I have been at this a while, and I have been at
19   trial testifying a pretty good bit.  But I tell
20   them -- and I feel like one of the most important
21   things I can do for any client, whether it be you or
22   Fraz here, is to make sure I didn't overreach and
23   make sure I stay within my wheelhouse of expertise,
24   education, training, experience.
25        This is a subject in backing accidents
```

First Choice Reporting & Video Services

Page 9

1  that I'm well-versed in.  I have driven a truck very
2  similar to the kind that was used in this crash.  I
3  mean, it would have been an older model than this
4  particular one.
5          I have owned these kinds of trucks.  I
6  have owned trucking companies.  One company I
7  managed had 120 trucks, in fact.  So I explained to
8  them a little bit about my background.  I don't
9  think it was a real lengthy spiel.
10     MR. AHMED:  I don't even think you told us that
11  much.
12  WITNESS CONTINUES:
13     A    I don't even know if they already had my
14  CV or not.  I just don't recall.  I try not to hard
15  sell too much, because I think it's a little
16  distasteful.
17     Q    Understandable.  Understandable.  Now,
18  with regards to the accident itself, you indicated
19  that they had told you what happened.  What do you
20  recall was told, specifically, to you?
21     A    Well, their client, Mr. Hairston, was a
22  dock employee at Wagner, the delivery point where
23  the accident took place.  And he was in the process
24  of rolling up the door that closed off the dock
25  opening area, when at the same time Mr. Nelson was

www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093

---

First Choice Reporting & Video Services

Page 10

1  backing in his trailer and struck Mr. Hairston with
2  some part of the trailer.  And they may have told
3  me, and I don't recall exactly this, but this did
4  become an important point, that the only way that
5  the door of the warehouse could be opened in the
6  morning, this was early in the morning, of course,
7  was for Mr. Hairston or someone else to get down at
8  ground level and walk out to this chain mechanism to
9  open up the door, since it wasn't an automatic door.
10     Q    Okay.  Now, with regards to review of
11  documentation, was it discussed what you would need
12  or was it discussed what they would be able to send
13  you?  What, exactly, was discussed with regard to
14  that?
15     A    I don't remember which came first, but at
16  some point I became aware of what kind of
17  documentation they had.  Of course I'm not
18  interested in -- and you would understand this, I'm
19  not disinterested in somebody's injury, but,
20  frankly, without being cold and callus, I don't
21  really care about all the injury issues and medical
22  testimony.  But I am interested in anybody that was
23  involved in the safety function; Mr. Hairston, of
24  course; Mr. Nelson, of course.  If there were any
25  eyewitnesses, of course I would be interested in

www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093

---

First Choice Reporting & Video Services

Page 11

1  that.  Any video, if there were any surveillance
2  video, I would be interested in that.  I think we
3  eliminated the surveillance video.  I don't think
4  there was any.  In fact, I even asked personally
5  that question when I visited Wagner and the manager
6  was there.  I think his name was Chad.  There was a
7  couple of statements that were taken contemporaneous
8  with the accident, I think one by Mr. Hairston and
9  one by Mr. Nelson.
10          And there is a deposition of Mr. Hairston
11  and deposition of Mr. Nelson.  I seem to have
12  misplaced Mr. Hairston's deposition for right now,
13  at least.  I must have misfiled it.
14          And they also sent me the interrogatory
15  and request to produce, answers, because I'm
16  interested, in my business, about what has been
17  asked for and what the response is.
18          Sometimes -- not particularly in this
19  case, but sometimes I'm as interested in what wasn't
20  produced as what was produced, because I understand
21  there are some things that a trucking company, for
22  example, is supposed to have and on file, and if
23  they don't have those, they are just derelict in
24  their duty.
25          And I asked if there were any pictures.  I

www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093

---

First Choice Reporting & Video Services

Page 12

1  don't know that there were any pictures initially.
2  Of course I had produced to you some pictures that I
3  took at the scene.  I think that's about all I
4  recall, as far as the production.  It's not as much
5  material as I'm used to seeing in some types of
6  vehicular crashes.
7     Q    Okay.  And then you stated at some point
8  there was a discussion of seeing the scene.  And
9  given the circumstances of this accident, you felt
10  it necessary to actually visit the scene of the
11  accident?
12     A    Correct.
13     Q    All right.  And with regards to this
14  telephone conversation or conference, did you bill
15  for that?
16     A    Well, the initial call I didn't.  But I
17  think we had a subsequent call as we were lining up
18  when I was going to be able to get into
19  Jacksonville, and there would be some small-time log
20  for that.
21          Typically, I charge a retainer fee that
22  includes a lot of incidental charges like FedEx
23  charges and supply charges and small phone calls.  I
24  don't really bill for small phone calls.
25     Q    With regards to your telephone

www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093

First Choice Reporting & Video Services

**Page 13**

```
 1  conversations and discussions that you have
 2  discussed, do you keep records of these discussions,
 3  any type of handwritten --
 4       A    Sometimes I do if there is something
 5  important.  I didn't in this particular case.
 6            Let me back up on that.  I may have.  I
 7  want to retract that.  I'm sorry, Mr. Gambler.  I
 8  did keep a record of an 8-11-14 phone conference, so
 9  I beg your pardon.  And it did involve, apparently,
10  Fraz and Zach.  And I have just a few notes here.
11  And I believe I provided this to you as part of my
12  file.  I should have.  I think it was scanned in.
13       Q    Okay.  Now, with regards to you said that
14  you charge a retainer for incidentals, original
15  calls, do you keep a billing record for things that
16  are charged to that retainer?
17       A    I do.  I do.  I don't have that with me.
18  What I plan to do is immediately after this -- I
19  have not sent a progress bill.  I will admit and
20  plead guilty that I'm a terrible biller, and
21  sometimes it bites me.  But I plan to, after we
22  conclude today, sometime this week or the first of
23  next week, to generate a progress bill.  And I would
24  be happy to give you a copy of that.
25            THE WITNESS:  Or give it to you, if you would,
```

www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093

---

First Choice Reporting & Video Services

**Page 14**

```
 1  Fraz, forward it on to Mr. Gambler.
 2       MR. AHMED:  Sure.
 3       THE WITNESS:  Or I will get your e-mail and I
 4  will send it to you.
 5       MR. AHMED:  I prefer you send it to us, and we
 6  will send it directly to Neal.
 7       THE WITNESS:  All right.
 8  BY MR. GAMBLER:
 9       Q    Okay.  With regards to your initial
10  instruction for retention I think you have kind of
11  gone over that, but if you could, when you were
12  initially retained, what was your specific charge,
13  so to speak, with regards to your initial retention?
14       A    To review the sequence of events involving
15  the backing up of this trailer, the opening of the
16  door to the warehouse.  And also I may have
17  mentioned that I thought it would be prudent to do
18  this, or they may have mentioned it, I don't recall
19  who suggested this, but I did review things like
20  hours of service, his freight movement.  We had
21  very, very, very little to go on.  There was very
22  little produced with regards to that.  But I did not
23  find, or either I did not have enough evidence to be
24  able to establish any types of hours of service
25  violations.  It's not to say there weren't some.  I
```

www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093

---

First Choice Reporting & Video Services

**Page 15**

```
 1  just did not have enough information to be able to
 2  properly analyze that.
 3            And I did look at Mr. Nelson's
 4  qualifications.  I didn't have a lot of information
 5  there, but I did not find enough evidence to
 6  establish that he was not properly qualified, either
 7  physically or otherwise.
 8            He being a very small company, in other
 9  words a one-horse show, obviously is not
10  sophisticated, and I don't mean that demeaningly, he
11  just doesn't have a reason to be real sophisticated,
12  so there is not a lot of training materials to be
13  found.  There is not policies and things like that,
14  for example, on backing.  Pretty much it's like he
15  testified, it's just I have just sort of always done
16  it this way.  And that's about all they have.
17       Q    Okay.  At any point in your retention did
18  your mandate change?
19       MR. AHMED:  Object to the form.
20  WITNESS ANSWERS:
21       A    What do you mean by "mandate"?
22       Q    Your assignment.  At any point was your
23  original assignment changed to a different
24  assignment?
25       A    No.  I believe that from the beginning to
```

www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093

---

First Choice Reporting & Video Services

**Page 16**

```
 1  the end it has all been about evaluating the backing
 2  procedure of Mr. Nelson.
 3       Q    Okay.  And with regards to that, I think
 4  we have kind of touched on some of them, but I would
 5  just like to go through, specifically, what,
 6  exactly, have you done with regards to your
 7  investigation, so to speak?
 8       A    I visited the scene.  I took some
 9  measurements, documented that either with photos or
10  on a legal pad.  I have reviewed the deposition
11  transcripts of Mr. Nelson of Mr. Hairston, the
12  statements that we discussed about that were taken
13  shortly after the accident, and then I compared what
14  I found there specifically with Mr. Nelson's
15  testimony about the series of events.  I compared
16  that with what I understand the industry standards
17  are to teach regarding the proper procedure for a
18  professional commercial driver to utilize when
19  backing up.
20            And essentially if I sort of boil it down,
21  and this is one of these kinds of cases where it's
22  not a lot of opinions, if I am looking at it from
23  30,000 feet, it's that Mr. Nelson failed to go back
24  inside the warehouse opening and surveil to make
25  sure that it was safe and no one was standing there
```

www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093

First Choice Reporting & Video Services

Page 17

1  before he backed up.  And had he done that, we
2  wouldn't be here today.
3      Q.   Okay.  With regards today's notice, I
4  believe you were asked to bring your file with you.
5      A.   Yes, sir.
6      Q.   I would like to go through the documents
7  contained in your file, if we could, to see what,
8  exactly, you have.  And I can identify them, if we
9  could.
10     A.   Unfortunately, I'm not going to have a lot
11  for you to look at, because everything I'm keeping
12  these days is electronic, unless I send something by
13  paper, sometimes I will shove it in a red folder
14  like this (indicating).  But half of this folder
15  contains stuff from you guys, a subpoena and so
16  forth.
17     I do have a couple copies industry
18  standards, a few pages of notes that I have taken by
19  hand, my retainer contract.  I do have a hard
20  copy of Mr. Thomas Baker's report.  And I believe
21  that's your engineer.  And then the rest I have
22  electronically, which I have submitted to you
23  already, we can review those.
24     MR. AHMED:  I was going to ask did you produce
25  that, because I know there was some back and forth

---

First Choice Reporting & Video Services

Page 18

1  about that.
2      THE WITNESS:  Well, I guess I need to ask
3  Mr. Gambler if he got it.
4      MR. GAMBLER:  Yes, I do believe we have gotten
5  it all.
6      THE WITNESS:  And the one thing I do not have
7  here and I don't have for some reason
8  electronically, apparently I have misfiled it,
9  Mr. Hairston's electronic transcript.  It won't be
10  the first time I have done that.  I probably plugged
11  it into somebody else's file, because I don't have
12  it in a hard copy.  And I apologize for that, but I
13  do have it and I did review it.
14     MR. AHMED:  Let's go off the record a second.
15  (Discussion Off The Record)
16  BY MR. GAMBLER:
17     Q.   In reviewing the documents in your file,
18  it looks like we have a letter from my office
19  regarding your fee for today's deposition.  That
20  kind of speaks for itself.
21     A.   Thank you.  I appreciate it.
22     Q.   I don't think we need to go over that, as
23  well as the subpoena and notice for today's
24  deposition.  We don't need to go over those.
25     All right.  We have the first

---

First Choice Reporting & Video Services

Page 19

1  documentation.  Can you please identify that, sir.
2      A.   Yes.  This is a report by Thomas Baker,
3  Professional Engineer.
4      Q.   And do you know who you received that
5  for -- or who you received that from?
6      A.   I received that from Fraz this morning.
7  And I may have gotten it previously, but I reread
8  that this morning in preparation for today.
9      Q.   Okay.  And does this report bear any
10  significance, with regards to your opinions, as to
11  the incident for which we are here for today?
12     MR. AHMED:  And before you answer that, I'm
13  glad you brought that up, Neal, because I want to
14  let you know that whether it does or not, we have
15  got the depo of David Dorrity coming up --
16     MR. GAMBLER:  He is sitting right there.
17     MR. AHMED:  The report of Thomas Baker.  And I
18  think his deposition is coming up next week, so we
19  are going to provide him the transcript of that too.
20  And if it does change his opinions or affect his
21  opinions, obviously, we are going to have him
22  supplement his report.  And also, just for the
23  record, we are going to provide him with the
24  depositions of Ed Nelson's optometrist and
25  audiologist, and if that affects his opinions in

---

First Choice Reporting & Video Services

Page 20

1  any way, will supplement his report and obviously
2  make him available for another deposition, if need
3  be.  Okay?
4      MR. GAMBLER:  Okay.  Sounds good.
5      THE WITNESS:  And at the other location we also
6  have a good video, as well as audio conference
7  center.  So if we want to supplement a deposition
8  without y'all coming up here, we can do that.
9      But I think there was still a lingering
10  question there.  But I think you were asking did
11  this report alter in any way or affect my
12  conclusions in my report, and the answer would be
13  sort of a guarded not really.  I would like to hear
14  Mr. Baker explain, in a little bit more detail
15  through his deposition, about, number one, how he
16  describes the role of a professional truck driver in
17  the backing procedure, particularly when it comes to
18  surveillance.
19     MR. AHMED:  And we will supplement accordingly
20  under the federal rules.  Thank you.
21  BY MR. GAMBLER:
22     Q.   All right.  Next document.
23     A.   The next document is some excerpts from
24  several industry texts that I alluded to in my
25  report.  Do you want me to list those?

First Choice Reporting & Video Services

Page 21

```
 1      Q   Yes, please.  Let's go line one at a time.
 2      A   Sure.  The first four pages are from a
 3  text known as trucking, Tractor-Trailer Driver
 4  Handbook, Workbook.  These particular copies were
 5  made from the second edition.  I have, I believe,
 6  all of the editions that have been produced by this
 7  organization.  But it's produced by the Professional
 8  Truck Driving Institute of America.  And the pages
 9  that follow the title page describe the training for
10  a professional truck driver regarding backing.
11          The next page, after those four, is an
12  excerpt from the 2009 Uniform Commercial Driver's
13  License Manual, page 2-9, where it discusses
14  backing.
15          Next is pages 58 and 59 from the National
16  Safety Council's defensive driving course for
17  professional truck drivers.  It also discusses
18  backing.
19          Next is a page from the National Safety
20  Council's Preventability Determination manual
21  regarding trucking accidents, and it's page 2.  And
22  among other things, it gives a definition of
23  preventability, and also the formula for being a
24  defensive driver.  And there is actually two pages
25  in that manual, pages 2 and page 13.  Page 13,
```

www.firstchoicereporting.com        Worldwide Scheduling        800.939.0093

---

First Choice Reporting & Video Services

Page 22

```
 1  specifically the paragraph that deals with accidents
 2  while backing.
 3          And then lastly there is a page from the
 4  Federal Highway Administration's Commercial Vehicle
 5  Preventability Accident Manual, page 24, where it
 6  talks about start-up, back-up procedures and advice
 7  for drivers and management, specifically with a goal
 8  in mind of preventing backing accidents.
 9      Q   Okay.  And these are all documents that
10  you had in your possession at the time of your
11  retention?
12      A   That's correct.
13      Q   Okay.  Let's go through the first four
14  from the workbook, if you could tell me what the
15  significance of those documents are with regards to
16  your opinion produced in your report.
17      A   Well, all of the pages have little bits of
18  information that are relevant to this particular
19  case, and particularly the way Mr. Nelson should
20  have backed.  Some of these he did.
21          There is one significant thing he did not
22  do, but the first thing that is mentioned, and the
23  way this training material typically works is with
24  every concept or every particular maneuver that a
25  driver is asked to do, they may give some type of
```

www.firstchoicereporting.com        Worldwide Scheduling        800.939.0093

---

First Choice Reporting & Video Services

Page 23

```
 1  tip or some type of acronym, or something like that
 2  to help the driver remember when it comes to
 3  backing.  Or if it were some other performance issue
 4  like turning, to remember those things.  And this
 5  particular tip for backing is the acronym GOAL,
 6  G-O-A-L, which stands for Get Out And Look.
 7          The general rules for backing safety, I
 8  believe, are applicable and would be helpful for the
 9  jury to understand and appreciate and let them make
10  their conclusions about whether or not Mr. Nelson
11  followed these things, where it talks about Inspect
12  Your Intended Path.  And without belaboring it too
13  much, I think that's essentially it.
14          The reason I copied these additional pages
15  is I wanted to give you a context.  In essence, I
16  copied the entire section for that topic of backing.
17      Q   All right.  Moving on to the next.
18      A   The next section would be the Commercial
19  Driver's License Manual and, specifically, under the
20  Backing Safely section, which is 2.2.4.
21      Q   Okay.  And what significance does that
22  have with regards to your opinion?
23      A   Well, there is a couple of things here.
24  The first is that the driver is admonished to --
25  encouraged to look at his path, look at his line of
```

www.firstchoicereporting.com        Worldwide Scheduling        800.939.0093

---

First Choice Reporting & Video Services

Page 24

```
 1  travel before he begins.  Get out and walk around
 2  the vehicle, check your clearance to the sides and
 3  overhead and in the rear, near the path that your
 4  vehicle will take.
 5          There could be several applications to
 6  that information, this instruction.  Obviously, if
 7  he were backing up in a truck stop there would be
 8  one particular type of method for fulfilling this
 9  particular instruction.  If he was backing up to
10  a -- I'm going to call it a common dock where the
11  dock board, the entrance into the warehouse is
12  actually elevated and you're not backing inside a
13  building, it would be a different concept of the way
14  he would get out and surveil.
15          In our particular case, specifically where
16  the truck is going to back six feet inside of a
17  building and there are cavities, and I think the way
18  Mr. Baker describes it, a pit area on either side,
19  that's probably not a bad term, people can be there,
20  objects can be there.  There can be a number of
21  things that are latent to the driver unless he walks
22  back there.  So I believe that would be applicable.
23          Next would be back slowly.  I don't know
24  the speed that Mr. Nelson was backing.  But when we
25  do everything slow -- unless we are racing, when we
```

www.firstchoicereporting.com        Worldwide Scheduling        800.939.0093

First Choice Reporting & Video Services

Page 25

```
1   do everything slow, it just makes for a safer
2   environment.  If we drive slower, if we turn slower,
3   if we back slower, as a trucker, it just makes for
4   things going a lot smoother and a lot safer.  We can
5   correct a lot of ills and mistakes if we are doing
6   it slowly.  Give people a chance to get out of the
7   way, for example.
8           Using the mirrors is also something that
9   could be applicable here.  Mr. Nelson did indicate
10  that he was looking in his mirrors.  I'm not exactly
11  sure why he wouldn't have observed Mr. Nelson.  I
12  don't have any better idea or insight than what he
13  has already testified to.  It would seem reasonable
14  to me, though, that given the -- I realize that
15  there is two measurements of openings of this
16  particular dock door.  There is the lower section
17  and opening, and Mr. Baker describes it as being
18  very narrow.  And I measured it, it's 11 feet wide,
19  the trailer is eight-and-a-half feet wide, plus a
20  little bit additional space for the trailer doors.
21  So it's pretty slim.  But 11 feet is not much
22  smaller than a lane of travel.
23          Typically, a lane of travel is about 12,
24  12-and-a-half feet wide, 12-and-a-half feet; maybe
25  13 feet on the interstate, possibly.  But there is
```

First Choice Reporting & Video Services

Page 27

```
1   backing into.
2           And again, it's my opinion that if
3   Mr. Nelson had done this, and I can't imagine myself
4   ever backing inside a hole in a building and not
5   knowing what's back there, I just cannot imagine
6   doing that.
7           I mean, I sort of think would I ever back
8   out of my driveway without getting out and checking
9   to see if my grandkids are there?  Of course we all
10  have got backup cameras now, but we don't have that
11  benefit with commercial trucks yet.
12          You check the surface, see if there are
13  any depressions, fixed objects, pedestrian traffic.
14  So there it mentions it specific.  And it's
15  reasonable for him to have assumed that there was a
16  pedestrian, a worker.  Not really a pedestrian, but
17  a worker that was administering the rolling up of
18  that door.  I believe, if his testimony is believed,
19  he was confused.  That the door was, in fact, not
20  automatic.  He wasn't quite sure, but he eventually
21  concluded he thought it was automatic, but rather
22  required a human to roll it up.  And that human
23  would have to be standing right there, on the ground
24  in that pit area.
25          And then he checked side clearances, and
```

First Choice Reporting & Video Services

Page 26

```
1   an extended area up above that, which you could
2   observe a human if they were standing in that.  But
3   that would be applicable.  It is certainly something
4   that they need to do.  But I understand that he was
5   looking back into a dark area, I think is the way he
6   described it.
7           Next is the National Safety Council's
8   defensive driving course, where it describes the
9   backing guidelines for a professional truck driver.
10  This is a course that I personally trained in and I
11  actually became certified as a trainer.
12          The truck driving course, the defensive
13  course is similar.  The jury can think of it, if any
14  of them -- and I know nobody around this table has
15  ever had to do this, but if they ever had to go to a
16  vocation tech school to try to attend a boring class
17  during the day to get points back on their license,
18  this is the equivalency for truck drivers.  It's
19  designed as a defensive driving course, and unless
20  you're teaching it to your own employees, you can't
21  teach it for hire unless you have been certified.
22          And this course here teaches the drivers
23  to -- and this is a really good concept here, to get
24  out and get the picture.  To walk around your
25  vehicle and get a complete picture of what you're
```

First Choice Reporting & Video Services

Page 28

```
1   after checking, started backing immediately before
2   the picture changes.
3           And the idea there is to go back and
4   surveil this pit area.  And when you make sure that
5   everything is clear, there is nobody there, there
6   are no objects you're going to back into, notifying
7   everybody I'm going coming back so that everybody
8   understands what you're going to do, Mr. Hairston
9   did not understand what he was getting ready to do
10  because he was still, according to his testimony,
11  performing his task of rolling the door up, or
12  completing that process.
13          Again, it mentions, and a lot of this is
14  redundant, to back slowly, check both sides as you
15  back.  And it's all in that section.
16          The next page is not specifically about
17  backing, but it's part of the National Safety
18  Council's Preventability Manual where it describes
19  the one definition -- and this is the National
20  Safety Council's definition.  I have heard others.
21  They all say about the same thing but maybe word it
22  slightly different, that a preventable accident is
23  one in which the driver failed to do to everything
24  that reasonably could have been done to avoid the
25  accident.
```

First Choice Reporting & Video Services

Page 29

1       There is always a lot of excuses that take
2   place after people make a mistake, get hurt.  But
3   the question here is, did Mr. Nelson do what he
4   reasonably could?  Not everything under the sun, but
5   what he reasonably could.  And it's my opinion that
6   it be reasonable.  In fact, I can't imagine a driver
7   not thinking it's reasonable to get out of his
8   truck, get a little exercise, walk an extra ten,
9   fifteen feet, however far back away from the dock he
10  was, he said fifteen feet, and look inside the hole.
11  Look inside the pit.
12      And the National Safety Council has
13  defined a formula for defensive driving as such.
14  Some of this is applicable to recognize the hazard.
15  This should have been a recognizable hazard, that
16  someone could be inside that hole inside that
17  warehouse I'm backing into.
18      Two, understand the defense.  I have
19  described the defense, to walk back in there and
20  surveil.
21      And then three, to act correctly in time.
22  This is more of a vehicular crash type concept, but
23  I think it's applicable here.  That once you
24  surveil, like the other text has indicated, you get
25  back in your truck and then you act quickly,

First Choice Reporting & Video Services

Page 30

1   checking your mirrors to make sure nothing changes.
2   That's page two.
3       But on page three of that same manual, it
4   gives guidance to the trucking industry when they
5   are looking back, in retrospect, about judging
6   whether or not an accident is preventable.  And
7   there are certain types of events or accident
8   categories that they have given guidance on that a
9   motor carrier should follow, and this would be used
10  for determining whether or not a driver is even
11  qualified to drive for you any more.
12      For example, if you said, "If you have two
13  preventable accidents in five years we will
14  terminate you," or whatever the policy might be,
15  here it says:  Accidents while backing, it says the
16  organization, meaning the trucking company, should
17  rule practically all accidents that occur while
18  vehicle is backing as preventable.  A professional
19  driver is not relieved of responsibility to back
20  safety when another person acts as a guide in the
21  maneuver.  He is ultimately in charge of that truck
22  and trailer.  Unless somebody is going to dive out
23  there behind him out of nowhere in a suicidal-type
24  mission, he is held responsible.
25      Lastly, the Federal Highway Administration

First Choice Reporting & Video Services

Page 31

1   page, page 24, which deals with, again, the
2   preventability idea, this is a government-sponsored,
3   produced document where it's giving guidance to the
4   trucking company.  And frankly, it's one of the few
5   documents where the government ever stepped down and
6   gave defensive driving information, instruction to
7   the industry.  It talks about driving tips for the
8   driver.  Before start up, back up, walk around the
9   vehicle, look underneath.  Ensure you have safe
10  clearance to start.  Don't forget to check blind
11  areas on the right, and in front as well.  This is a
12  blind area.  To him, he could not see around that
13  corner unless he was Superman.
14      After you walk around, check, don't delay
15  in moving the vehicle again.  This is a little bit
16  of repetition, but good concepts that are typically
17  repeated elsewhere.
18      Check your mirrors.  Start up slowly.  Tap
19  horn in congested areas or recruit a signalman.
20      I'm not sure that a signalman would have
21  benefited in any way, so I'm not going to be
22  critical of Mr. Nelson for not having a helper or
23  signalman in this particular instance.
24      And, by the way, tapping the horn, and I
25  mention that in my report, is mentioned elsewhere in

First Choice Reporting & Video Services

Page 32

1   some of these other texts.  I don't ever get a
2   package delivered to my office that I don't hear the
3   UPS guy tapping his horn.  He even taps his horn
4   when he starts off, you know, going forward.
5       Q    All right.  The next document.
6       A    We talked about this document earlier.
7   It's a few notes that I took from a phone conference
8   on 8-11-2014.
9       Q    All right.  And that was created by you?
10      A    Yes, sir.
11      Q    And with regards to your report, does that
12  document have any significance with regards to your
13  opinion?
14      A    Well, it is just stating some facts about
15  who was involved is in this accident, Nelson
16  Transport, Mr. Hairston, what he did, where he
17  worked.  I suppose it has some impact, but it
18  doesn't give me anything that I haven't learned
19  elsewhere.  I mean, if we threw this away, my
20  opinions don't live or die on this document.
21      MR. GAMBLER:  All right.  I will attach this as
22  Defendant's 1.
23      (Exhibit No. 1, 8-11-14 Handwritten Notes, was marked)
24  BY MR. GAMBLER:
25      Q    This next document, please.

First Choice Reporting & Video Services

Page 33

```
 1       A    That sure looks pretty bad, doesn't it?
 2   This looks like something I had in my pocket for a
 3   while.  It's just a little scratch pad that has cell
 4   phone numbers for both Zach and Eric.  I probably
 5   wrote this down off of that particular notepad,
 6   legal pad information, but it's really just phone
 7   numbers.  I wrote it on 8-11.  And I guess on the
 8   back side I must have given myself a reminder to
 9   carry my measuring equipment.
10       MR. GAMBLER:  Okay.  I will mark this as
11   Defendant's 2.
12   (Exhibit No. 2, 8-11 Handwritten Notes, was marked)
13       MR. GAMBLER:
14       Q    The next document, please.
15       A    Okay.  The next document, on this graph
16   paper, is my notes that I took while I was at the
17   site on 8-20-14.
18       Q    So that was created by you?
19       A    Yes.
20       Q    And what significance does this document
21   have, with regards to your opinion?
22       A    It indicates that what I observed, as far
23   as the door opening, for door number one where our
24   accident took place, that there has been some
25   modification to that door opening.
```

www.firstchoicereporting.com      Worldwide Scheduling      800.939.0093

First Choice Reporting & Video Services

Page 35

```
 1   (Exhibit No. 3, Handwritten Notes From Site Visit,
 2   was marked)
 3   BY MR. GAMBLER:
 4       Q    All right.  This document, sir.
 5       A    This is a fee contract for this project.
 6   And that's all I have received so far.  I haven't
 7   billed.  I have exceeded that slightly, would be my
 8   sense, because I made a trip all the way down there
 9   and had some expenses.  But I can't tell you, as I
10   sit here, how much I have exceeded that.
11       Q    Okay.  This would reflect the retainer
12   that you had spoken of earlier?
13       A    Yes.
14       MR. AHMED:  Number 4?
15       MR. GAMBLER:  Yes, 4, please.
16   (Exhibit No. 4, Fee Schedule Contract, was marked)
17   BY MR. GAMBLER:
18       Q    And then the last one is, again, a copy of
19   the deposition subpoena.  I think we are good with
20   that.
21       Now, with regards to the documents, the
22   composite of documents that you had referred to
23   earlier with regards to the Trucking Tractor-Trailer
24   Workbook, the National Safety Council documents, all
25   those, can you just confirm that you have made no
```

www.firstchoicereporting.com      Worldwide Scheduling      800.939.0093

First Choice Reporting & Video Services

Page 34

```
 1       I'm going to rehabilitate my previous
 2   answer.  I think I testified earlier that the bottom
 3   area opening was 11 feet.  That wasn't modified.
 4   But the opening that is sort of notched out, that I
 5   observed, was apparently not in existence at the
 6   time of this accident.  So I want to change that
 7   part of my testimony.  The only other thing that I
 8   helped establish was that the door was manual, it
 9   was not automatic, and there is a pull-chain pully
10   system.
11       Of course I established the depth, from
12   the wall back to the dock, it's roughly six feet.  I
13   established where the parking areas were that
14   Mr. Nelson describes in his deposition.  When they
15   open, I established that.  I think, at that point in
16   time, it was 7:00 a.m.
17       I arrived when it opened, too.  That was
18   one of the ideas, we wanted to get there early.
19   Chad wanted us to try to get there before all the
20   traffic and everything picked up.  But I think, when
21   I was arriving, it was like 8 a.m.  I think they
22   change it, depending on the season, perhaps.  That's
23   about all that this note has bearing on it.
24       MR. GAMBLER:  Okay.  I will mark this as
25   Defendant's 3.
```

www.firstchoicereporting.com      Worldwide Scheduling      800.939.0093

First Choice Reporting & Video Services

Page 36

```
 1   notations on those or marks on the documents and
 2   that they have not been altered in any way by you?
 3       A    I have not altered them in any way.
 4       THE WITNESS:  Would this be a good time to take
 5   a comfort break?
 6       MR. GAMBLER:  Yes.
 7   (Break In Proceedings)
 8   BY MR. GAMBLER:
 9       Q    All right.  Now, with regards to -- let's
10   move forward to your actual investigation that was
11   conducted.  With regards to this matter, who,
12   exactly, have you spoken to regarding this?
13       A    Well, are you talking about the actual
14   investigation and what I found out at the site?
15       Q    I would say basically from your retention,
16   who are the individuals that you have spoken to
17   regarding this matter?
18       A    Okay.  I have spoken to Mr. Von Roenn.  I
19   don't recall if I had another conference with
20   Mr. Block or not.  And I don't recall if Fraz and I
21   had a conversation or not about that.  I know that I
22   addressed my report to Zach Von Roenn, because he
23   was the one that requested the report.  And then it
24   has gone silent for a little while.  And that's
25   typical.  I mean, it just happens that way.  I do my
```

www.firstchoicereporting.com      Worldwide Scheduling      800.939.0093

First Choice Reporting & Video Services

Page 37

```
1    work, and I don't know if the case is going to
2    resolve.
3          And, of course, I'm waiting for somebody
4    to say, you know, "We are settling and send us your
5    final bill," but that never happened.  And the next
6    thing I know, I'm getting a call to do the
7    deposition.  So there hasn't been a lot of
8    back-and-for conversation.
9       Q    So with regards to, let's say, attorneys,
10   at some point throughout the course of this,
11   throughout the course of everything you have spoken
12   to Mr. Von Roenn, you have spoken, obviously, with
13   Fraz, and you have spoken with Rick?
14      A    Yeah.  And I did speak with --
15           MR. AHMED:  Well, I'm just going to object, to
16   the extent he said he is not sure if he spoke with
17   Rick.
18           THE WITNESS:  Yeah, I'm not sure if I spoke
19   with him or not.
20           MR. AHMED:  And just for the record, I don't
21   think he ever did.  But anyway, go ahead.
22   WITNESS CONTINUES:
23      A    And I did speak, on the day of my
24   inspection, with Chad.  And I'm sorry I did not get
25   his last name, but he represented as being the
```

www.firstchoicereporting.com    Worldwide Scheduling    800.939.0093

---

First Choice Reporting & Video Services

Page 39

```
1    actually opened it up when you get above about three
2    feet or so.
3          He described that the procedure was
4    standard, that at the beginning of the day somebody
5    like Mr. Hairston would go down and open up the
6    door, or doors, depending on how many trucks they
7    had ready to be loaded.  That's all I recall.
8       Q    Okay.  So would you say that this was more
9    like a conversational dialogue while you're
10   inspecting the site, as opposed to just a sit-down
11   conversation?
12      A    It would be the first.  It was just
13   conversational, just trying to get a lay of the
14   land, trying to understand the standard procedures,
15   focus strictly on what Mr. Harrison's duties were
16   and how, if at all, the conditions had changed where
17   the accident took place.
18      Q    Okay.  Now, apart from your conversation
19   with Chad during the site visit, did you, at any
20   other time, have discussions with Chad?
21      A    No.
22      Q    Okay.  Have you had an opportunity to
23   speak with either Mr. Nelson or Mr. Hairston
24   regarding this incident?
25      A    No.
```

www.firstchoicereporting.com    Worldwide Scheduling    800.939.0093

---

First Choice Reporting & Video Services

Page 38

```
1    manager at Wagner, and he was the manager at the
2    time of the accident too.
3       Q    Actually, good segue.  We are moving right
4    into that.  So you spoke with Chad at -- he would be
5    with Wagner.  Correct?
6       A    Correct.
7       Q    And he is the manager and was the manager
8    at the time of the accident?
9       A    Correct.
10      Q    Do you know how long this conversation
11   lasted?
12      A    Well, he was there just to attend to us
13   while I was walking around the platform, walking
14   around the pit area, making sure that, of course,
15   for my safety, that trucks were not coming in there
16   and collecting me up in them.  I asked him, frankly,
17   what I could ask him.  And he said, you know, you
18   can ask me, but don't be offended if I tell you I'm
19   not going to answer that.  But I asked him about the
20   dock door and what the condition was at the time of
21   the accident and how it had been altered, if at all,
22   and that's when I learned that the dock door had
23   been altered.  In other words, the dock door, on the
24   day of the accident, was not the same as what I
25   observed.  And I described what they changed.  They
```

www.firstchoicereporting.com    Worldwide Scheduling    800.939.0093

---

First Choice Reporting & Video Services

Page 40

```
1       Q    Did you have an opportunity to speak with
2    anyone else at Wagner while you were doing the site
3    visit?
4       A    I may have spoken to one of the ladies in
5    the office, but it wasn't an information
6    conversation.  It was just niceties.  We did go in
7    through the very door that someone who would be
8    coming to present, like Mr. Nelson would go in.  We
9    went in the very lobby.  And then we walked through
10   the lobby, through the office, into the warehouse.
11          It seemed like maybe there was one or two
12   ladies that were there.  There were already dock
13   workers on the platform beginning to do work.
14      Q    Did you have an opportunity to speak to
15   any of the dock workers while you were there?
16      A    No.
17      Q    Okay.  And apart from the individuals that
18   we have spoken about so far, have you spoken to
19   anyone else regarding this incident?
20      A    No.
21      Q    Okay.  Did you have an opportunity to --
22   and I believe you already stated you had an
23   opportunity to review statements given by both
24   Mr. Hairston and Mr. Nelson.  Do you have copies of
25   the statements?
```

www.firstchoicereporting.com    Worldwide Scheduling    800.939.0093

First Choice Reporting & Video Services

Page 41

```
 1        A    Electronically.
 2        Q    Okay.  Do you know who provided those
 3   statements to you?
 4        A    I'm pretty sure those came from Zach's
 5   office.
 6        Q    Okay.  Now, with regards to the
 7   statements, do you know when they were taken?
 8        A    I don't recall.  I don't know if they are
 9   dated or not.  I could look.
10        Q    Could you please?
11        A    Well, I'm sorry.  Neither statement is
12   dated.  Wouldn't you know it's signed, but they are
13   not dated.  I don't know.  It probably wouldn't help
14   you to know the date of the document, as far as the
15   property.  I have got a property created date of
16   8-18-2014, but my experience has been that could be
17   the very date that I loaded it into my computer.
18        MR. AHMED:  You're looking on your computer's
19   properties?
20        THE WITNESS:  Yeah.
21   WITNESS CONTINUES:
22        A    Unless you had a Metadata expert, I don't
23   know when that document was originally saved.  I
24   think that's when I actually loaded it into my
25   computer or loaded it into my file.
```

www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093

---

First Choice Reporting & Video Services

Page 42

```
 1        Q    Okay.  So the date that you believe it was
 2   created, that would have been about the date that
 3   you received it?
 4        A    I think so.
 5        MR. AHMED:  Whoa, whoa, whoa.  Hold on.  Can
 6   you repeat that one more time?  The date that the
 7   document was created?
 8        MR. GAMBLER:  No.
 9   EXAMINATION RESUMED BY MR. GAMBLER:
10        Q    The date it was created in your computer
11   would have been the date that you would have
12   received it, or around that time?
13        A    Around that time.
14        Q    I won't hold you to the date and minute.
15        A    Sure.  It could have sat in my in box for
16   a day, or something like that, before I actually
17   downloaded it into my file.
18        Q    And what date was that again?
19        A    8-18-2014.
20        Q    Okay.  And when did you review the
21   statement?
22        A    I can't tell you.
23        Q    But it would have been prior to completing
24   your report?
25        A    Yes.
```

www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093

---

First Choice Reporting & Video Services

Page 43

```
 1        Q    And just so we have it -- so it's clear,
 2   as I understand it you, you have statements of
 3   Mr. Nelson and Mr. Hairston that you have reviewed
 4   and copies of which were given to you, but you do
 5   not have them here, today, correct, the hard copies
 6   here today?
 7        A    Correct.
 8        Q    They are on your computer.
 9        A    I have just an electronic version.
10        Q    Okay.  And are there any statements that
11   you reviewed that you do not believe are true?
12        MR. AHMED:  Object to form.
13   WITNESS ANSWERS:
14        A    That's a good question.
15        MR. GAMBLER:  Does that constitute a waiver of
16   Fraz's objection?
17        MR. AHMED:  No, it does not.
18        THE WITNESS:  We will let the Judge decide.
19   WITNESS ANSWERS:
20        A    I don't believe this is the type of
21   accident or incident where I need to determine that
22   something is not being told correctly or told
23   truthfully, because my role, in this particular
24   case, is to help the jury to understand what the
25   procedure is for a professional truck driver like
```

www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093

---

First Choice Reporting & Video Services

Page 44

```
 1   Mr. Nelson, and how if he had done what is the
 2   common practice and that the industry standards
 3   represent for him to do and recommend for him to do,
 4   then he would have observed Mr. Hairston.
 5        All of the differences between where
 6   Mr. Hairston is and coming out to the truck
 7   afterwards, all of those things are really not part
 8   of my role at all.  I don't know if it's part of
 9   anybody's role.  It really doesn't have anything to
10   do with how the accident happened.  And that's the
11   area I'm focused on.  Not on his injuries or
12   anything like that, but just simply the failure to
13   follow the procedures.
14        So I don't typically try to judge
15   somebody's truthfulness unless it's just so blatant.
16   So that's probably about the best I can do with that
17   particular question.
18        Q    Okay.  Now, with regards to additional
19   materials that you reviewed that you did not bring
20   with you here today, I believe you indicated there
21   were additional materials on your computer that you
22   reviewed in preparing your opinion.  We have already
23   gone over the statements from Mr. Nelson and
24   Mr. Hairston.  Are there any other materials that
25   you reviewed that we have not discussed today?
```

www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093

First Choice Reporting & Video Services

Page 45

```
 1      A    No.
 2      Q    I believe you indicated that you had gone
 3  over the depositions, correct, the depositions of
 4  Mr. Hairston and Mr. Nelson?
 5      A    That's correct.  Only those two.
 6      Q    Okay.  And do you recall who gave you
 7  those materials?
 8      A    It came from Zach's office.  I don't
 9  remember exactly who sent those by e-mail, but it
10  would have been one of his paralegals.
11      THE WITNESS:  Was it Rene?
12      MR. AHMED:  I'm not sure.
13  BY MR. GAMBLER:
14      Q    Do you recall when you received those?
15      A    I don't.  I can probably tell you when I
16  put them in the file.  It would have been generally
17  around that time period, the depositions, August 28,
18  somewhere in that neighborhood.  The
19  interrogatories, the request to produce were around
20  that same time period.
21      Q    Now, when you say there were
22  interrogatories and requests for production
23  responses, are those the defendants' responses to
24  the interrogatories or the plaintiff's responses?
25      A    The plaintiff's.  That's about it.  It
```

www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093

First Choice Reporting & Video Services

Page 47

```
 1      A    I don't believe it altered my opinion.  I
 2  did pick up one key bit of information that I
 3  believe helps to explain why Mr. Nelson may have
 4  thought he didn't have to go in and surveil that pit
 5  area, and that is -- and I had not -- I just maybe
 6  didn't pay attention to it before, and I don't think
 7  it's in my report, on or about somewhere around page
 8  57, somewhere in that neighborhood Mr. Nelson talks
 9  about -- when he was asked the question was he aware
10  if the warehouse door had to be raised manually or
11  if it was automatic, he eventually concluded that he
12  thought it was automatic.  He wasn't positive, but
13  it seemed like he settled on what he believed to be
14  that it was automatic.
15      Now, if it was automatic, then that might
16  help to explain why he didn't -- he thought maybe he
17  didn't need to go back there and look at it.  It's
18  not an excuse, but just an explanation.  But those
19  are the kinds of things that he cannot put for
20  chance.  He needs to know that.
21      I suppose also what is revealing is that I
22  don't know how many trips he had made there, but by
23  his own testimony he had been there numbers of
24  times.  It would seem to me that you would have
25  recognized that kind of thing about whether or not
```

www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093

First Choice Reporting & Video Services

Page 46

```
 1  looks like everything was received right in -- right
 2  up to or just before August 28.
 3      Q    Now, with regards to the depositions, what
 4  significance would they have with regards to your
 5  opinion?
 6      A    Mr. Nelson's account of what he did prior
 7  to backing into the door, since my only opinions
 8  deal with his actual performance and doesn't deal
 9  with anything to do with his qualifications or other
10  regulatory issues, the opinions were focused
11  around what he did as he backed his trailer up, and
12  then from backing his trailer up until the time that
13  he backs inside the building, those sections would
14  be what I would be focused on.
15      Q    Okay.  And do you recall when you reviewed
16  the depositions?
17      A    It was before the report, which was dated
18  August the 29th.  So it would have been around
19  August the 28th, or something like that.  I did
20  review Mr. Nelson's deposition again yesterday, in
21  preparation for the deposition today.  I reviewed it
22  last night so it would be fresh.
23      Q    And did your review of Mr. Nelson's
24  deposition last night alter your opinion that was
25  previously published on August 29th?
```

www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093

First Choice Reporting & Video Services

Page 48

```
 1  they were automatic or manually.  In any event,
 2  whether they are automatic or manual, I think the
 3  driver should still go back there.  But I only bring
 4  that up that it might help to explain why he did
 5  what he did in shortcutting the safety process,
 6  failing to do the GOAL, get out and look.
 7      The only other thing, in review of the
 8  deposition and trying to synthesize all of the
 9  information, is when did this door actually finally
10  get all the way to the top and completely raised?
11      Mr. Nelson testified that it was while he
12  was on the ground at the back of his trailer, and
13  then after the door was raised he went and got in
14  the truck, which doesn't seem to mesh with
15  Mr. Hairston's account that he is still rolling the
16  door up.  And he is right there in harm's way, in
17  this pit, I can't imagine why he would want to
18  remain there and is struck.
19      When I was there I had the benefit of a
20  ladder that was put down there, I think by Chad or
21  one of the dock workers, to help me get up and down
22  when we went ahead and put a trailer into the door.
23  Otherwise, a guy my size, I might have a hard time
24  getting out of there.  But those are the things that
25  jumped out after my second review.  The I review
```

www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093

First Choice Reporting & Video Services

Page 49

1  it a third time, maybe there will be something else.
2  I don't know, but those things in particular,
3  particularly the first one, I think is important.  I
4  think it's important for -- it's important to me.  I
5  would explain to a jury it's critical that the truck
6  driver cannot leave things like this for chance.
7  Hey, I'm assuming -- and we all understand what
8  assume will get you, but I'm assuming that it's
9  automatic and there should be no human down there in
10  that pit when, in reality, Mr. Hairston is down
11  there just doing his job, and that is to roll that
12  door up and give him enough time to get out of the
13  way.  And, unfortunately, Mr. Nelson didn't give him
14  enough time.
15      Q    Okay.  Do you recall where you reviewed
16  the depositions?
17      MR. AHMED:  You said where?
18      MR. GAMBLER:  Where.
19      MR. AHMED:  Where.
20  WITNESS ANSWERS:
21      A    Boy, that's a good question too.  You
22  mean, was I in the swimming pool or was I bass
23  fishing?
24          Seriously, I don't recall.  I do most of
25  my review at my desk in my office.  Frankly, and I

Page 51

1  through them, but I don't pay as close attention to
2  the nonrelevant parts as I do the parts that are in
3  my area of expertise and that I'm going to opine to.
4      Q    And with regards to the interrogatories
5  and request for production responses, did you
6  receive those from Zach also?
7      A    Yes.
8      Q    Approximately the same date?
9      A    Yes, sir.  This particular case, this is
10  one of those where, you know, I responded, "You need
11  it when?"  I mean, we were working at warp speed.
12  I'm really surprised that I was able to work in the
13  time frame, but they seem to be really nice guys.
14  Don't you agree?
15      Q    Always.  And did you review the rogs and
16  requests for production prior to finalizing your
17  report on August 29th, as well?
18      A    The question again, sir?
19      Q    Did you have an opportunity to review the
20  interrogatory responses and request for production
21  responses filed by the plaintiff prior to your
22  August 29, 2014 report?
23      A    Yes.
24      Q    And what significance did this information
25  have for you, with regards to your opinion, if any?

Page 50

1  will just confess now, I occasionally am sitting in
2  an easy chair.  As you can see, sitting on the table
3  here, I'm sort of an electronic guy.  And for my
4  age, I have really stayed way ahead on the
5  electronics.  I just bought into it early, so I use
6  iPads and things like that.  I have some little apps
7  that I can actually cut and paste and drag and drop
8  stuff if I need to.  I honestly could not tell you
9  where I actually reviewed them.  I will tell you
10  that in reviewing last night, I was, in fact,
11  sitting in my easy chair.
12      Q    I won't hold that against you.
13      A    Thank you.  As long you don't bring that
14  up at trial.
15      Q    Now, when you were reviewing the
16  depositions, did you read the whole depositions or
17  just particular sections of the depositions?
18      A    For Mr. Nelson, I read the whole
19  deposition.  For Mr. Hairston, on the other hand,
20  when it comes to things about medical conditions and
21  things like that, a lot of times I will just -- I
22  will fly right through that and try to get to the
23  parts that are important to me.  And I think that's
24  fairly fair.  I guess it depends on your
25  expertise, what you're looking at.  I do read

Page 52

1      A    None.  Not anything.
2      Q    At any time prior to or since completing
3  your report have you had an opportunity review the
4  defenses' discovery responses?
5      A    Not that I recall.
6      Q    Do you think that would be beneficial in
7  any way or have any effect on your opinion that you
8  rendered on August 29th?
9      MR. AHMED:  Object to the form.
10  WITNESS ANSWERS:
11      A    Well, I obviously, don't know what I don't
12  know, so I wouldn't be a very good expert.  You
13  know, we are all document hounds.
14      MR. AHMED:  I'm going to address it on cross,
15  but just so you can ask the questions you need to
16  Neal, because you're probably going to have some
17  more questions, what I was going to ask, because his
18  report says he did have the defendants' answers to
19  interrogatories, so I'm going to ask him about that
20  on my cross, and then I'm sure you're going to have
21  a bunch of other questions, so I'm willing to put
22  that out there so you can ask what you need to ask
23  now, as opposed to doing it an hour or two from now.
24      MR. GAMBLER:  All right.
25  EXAMINATION RESUMED BY MR. GAMBLER:

First Choice Reporting & Video Services

Page 53

```
 1        Q    Counsel has indicated that you have
 2   reflected in your report that you reviewed the
 3   defenses' interrogatory responses.
 4        A    You know, that is true.  And I'm
 5   embarrassed here because, you know, I talked about
 6   this earlier, that I looked at the guy's
 7   qualifications and his hours of service and bills of
 8   lading, so I am really thinking that I have misfiled
 9   some stuff.  That being said, I didn't have any
10   opinions, adverse opinions about any of that
11   information.  So I am going to have to go back and
12   do some reorganization and redigging here.
13        Q    So those are documents that you do not
14   have in your file, as we speak today?
15        A    Correct.
16        Q    And I believe you stated previously that
17   you had arrived at a conclusion as to this matter?
18        A    Yes, sir.
19        Q    Can you please read or state your opinion
20   for the record?
21        A    Yes.  Well, the first opinion that I have
22   is that -- regarding Mr. Hairston, as far as I can
23   tell, he acted reasonable, without any known fault
24   in performing his duty of opening the door to the
25   warehouse entrance to the dock.
```

First Choice Reporting & Video Services

Page 55

```
 1   to the door opening, but he just had no advance
 2   notice, or at least he didn't have -- or felt like
 3   he had any advance notice that Mr. Nelson was
 4   backing into the doorway prior to him being struck,
 5   and that Mr. Hairston had every reasonable
 6   expectation the driver would not back up while he
 7   was performing his necessary duty.  And I guess I
 8   would add and then allow him enough time to cross
 9   over and get out.  That's opinion number one.  Do
10   you want me to go to opinion number two?
11        Q    Yes, please.
12        A    Opinion number two is Mr. Nelson deviated
13   from industry standards by backing into the
14   warehouse while Mr. Hairston was still in the door
15   opening and completing the opening of the door.
16        Mr. Nelson testified that the rear of the
17   trailer was about ten feet from the door before
18   backing into the opening, and that the warehouse
19   door was already fully open.  That he looked and saw
20   no one in the doorway or dock entrance area at that
21   time.
22        He testified the door was already fully
23   open at that time and returned to his truck cab and
24   began to back in.
25        Mr. Nelson's testimony is inconsistent
```

First Choice Reporting & Video Services

Page 54

```
 1        I have talked with the manager, that that
 2   was a routine practice for him to go down and roll
 3   the doors up.  There is no other way for the door to
 4   get up but for him climbing down into this pit area
 5   and rolling that door up.  By the way, the staircase
 6   is not in the pit area where he was standing.  The
 7   staircase is actually -- would be on the other side
 8   of the trailer, if the trailer is in that area.  So
 9   by design, he has to have some amount of time to
10   depart from that pit area on the passenger side of
11   Mr. Nelson's trailer, to be able to get to the
12   driver's side of that trailer where the staircase
13   is, if that makes sense.
14        Q    Yes.
15        A    Now, I have got some sub-points to that,
16   but they are in the report.  It appears that the
17   door had to be opened by Mr. Hairston.  It was done
18   in the normal way on that morning.
19        Mr. Hairston testified that the chain
20   mechanism required that he partially place his body
21   in the door opening during the opening procedure.
22   And that's just what he testified.  I don't know if
23   that's the case or not.  I didn't experiment with
24   trying to raise the door in any kind of way.
25        Mr. Hairston said he saw the trailer close
```

First Choice Reporting & Video Services

Page 56

```
 1   with Mr. Hairston's testimony, who said he didn't
 2   see Mr. Nelson when he began opening the door, only
 3   the back of an open trailer close to the door.
 4        Mr. Nelson could have prevented the
 5   accident by following the industry standards of
 6   looking at his path before backing.  And I give a
 7   citation there from the Florida CDL Handbook.
 8        The instruction to Mr. Nelson and others
 9   is to check the clearance and path he is attempting
10   to back into.  He is the captain of the truck and
11   doesn't back up unless it is absolutely safe to do
12   so.  Mr. Nelson did not do this.
13        Had Mr. Nelson stood at the back of his
14   trailer and waited on the door to be completely
15   open, ensured that Mr. Hairston had returned to the
16   dock platform before backing, the accident would not
17   have happened.
18        So that's two ways that he could have
19   either observed him walking out of the way, but then
20   I believe he still needs to go back and make sure he
21   is up on the platform; or he could walk back and
22   surveil that, either one of those two methods.
23        And then lastly on that point, the
24   sub-point is that Mr. Nelson also deviated from
25   industry standards by failing to sound his horn two
```

First Choice Reporting & Video Services

Page 57

1  or three times before beginning to back, and I give
2  a citation there.  Doing this would likely have
3  alerted Mr. Hairston of unexpected danger, and he
4  could have moved out of the doorway.
5       Mr. Hairston testified that he didn't see
6  Mr. Nelson's four-way flashers engage, which, if so,
7  would be further deviation from the industry
8  standards.  And I realize there is a conflict in
9  testimony there.  Mr. Hairston says he didn't see
10  four-way flashers.  I don't know what difference
11  that would have made if it would have.
12       Mr. Nelson indicated he turned on his
13  four-way flashers.  I will just let the jury decide
14  who they want to believe.
15       And then my last opinion is Mr. Nelson
16  committed a preventable accident by backing into
17  Mr. Hairston.  It's just another sort of finer point
18  to this.  Because in our industry, and really in
19  occupational safety as well, we look, not
20  necessarily always, at fault.  I know that's a part
21  of the whole idea of insurance and of our industry,
22  but we look at preventability because we realize we
23  are commandeering an instrument that can exert a lot
24  of injury to somebody else and almost no injury to
25  the driver.

www.firstchoicereporting.com    Worldwide Scheduling    800.939.0093

---

First Choice Reporting & Video Services

Page 59

1  responsible for making sure the pathway is clear and
2  that clearances are safe.  And I give a citation
3  there.
4       The accident has the earmarks of a driver
5  who was either lazy, in a hurry, careless, or all
6  three.
7       That concludes my opinions.
8    Q  Okay.  So just to clarify, your opinion is
9  with an understanding that there is a discrepancy in
10  the testimony of Mr. Hairston and Mr. Nelson
11  regarding whether or not the door was actually up or
12  not.
13    A  Completely up, yes.
14    Q  And just to clarify, Mr. Nelson has
15  testified that the door was completely up, whereas
16  Mr. Hairston has testified that, in fact, the door
17  was not completely up.
18    MR. AHMED:  Object to form, to the extent of
19  point and time.
20  WITNESS ANSWERS:
21    A  Yeah.  I think, if I understand
22  Mr. Hairston's testimony, it is that he was in the
23  process of completing getting it all the way to the
24  top.
25    Q  Now, should it be proven at trial that the

www.firstchoicereporting.com    Worldwide Scheduling    800.939.0093

---

First Choice Reporting & Video Services

Page 58

1       Only 5 percent -- of commercial vehicle
2  crashes that involve fatalities, only 5 percent
3  involve the truck driver.  It's the other person.
4       We had an exception to that in Greenville
5  County yesterday when we had two drivers of trucks
6  that were ejected somewhere in South Carolina, I
7  think it was.
8       So Mr. Nelson, in this preventable
9  accident, he failed to properly walk all the way to
10  the dock, get a complete picture, you have a
11  citation there.  Then, without delay, walked to his
12  cab and began backing to avoid other hazards from
13  approaching, and I give a citation there.
14       Mr. Nelson may have looked from ten feet
15  away, but was in his truck for a period of time
16  while the door was being raised.  Now, that's taking
17  into account that he wasn't -- the door wasn't
18  raised all the way when he was at the back of the
19  trailer.  So Nelson's earlier surveillance was of no
20  use in seeing Mr. Hairston.  As Mr. Nelson
21  testified, his mirror was of little help because of
22  the swing-out doors blocking much of the view of the
23  opening.
24       Backing accidents are almost always
25  preventable, because the truck driver is ultimately

www.firstchoicereporting.com    Worldwide Scheduling    800.939.0093

---

First Choice Reporting & Video Services

Page 60

1  door to the loading bay was completely up -- was
2  completely up, as testified by Mr. Nelson, would
3  that change your opinion?
4    MR. AHMED:  Object to form.
5  WITNESS ANSWERS:
6    A  No.  No.  And I can explain that, if you
7  would like.
8    Q  Okay.
9    A  You know, sometimes we all like to use a
10  hypothetical.  Experts sometimes hate answering the
11  hypotheticals, but I'm going to pose one to explain
12  this.  If we assume, for a second, that Mr. Nelson
13  presents and backs his truck in and the door has
14  always been open, it changes none of my opinions
15  that I have presented here, today, that I believe he
16  should GOAL, get out and look.  He should walk back
17  there, surveil that pit and make sure there are no
18  objects or nobody back there that he could back
19  over.
20       Again, this is a unique environment.  He
21  is backing inside of a building before he hits the
22  dock, as opposed to backing into a conventional dock
23  that is on the exterior of the building, or flush to
24  the side of the building.
25       The only additional opinions that are

www.firstchoicereporting.com    Worldwide Scheduling    800.939.0093

First Choice Reporting & Video Services

Page 61

```
 1  affected is the whole issue about when this door
 2  goes up and down, and the assumption that somebody
 3  is back there and moving that door up and down.
 4        Mr. Nelson has to admit that he knows
 5  somebody is moving that door up and down, because he
 6  sees the door going up.
 7        What he doesn't see, or says he doesn't
 8  see or doesn't identify, is where the person is
 9  that's moving that door up.  So shame on him for not
10  identifying that.  I mean, it has to be a hazard, in
11  his mind.  He just flatout overlooked it or did
12  something else.
13     MR. AHMED:  Whenever you get to a point of
14  transition, how about a break?
15     MR. GAMBLER:  Actually, we can do that right
16  now.
17  (Break In Proceedings)
18  BY MR. GAMBLER:
19     Q   All right.  Now, going back to your
20  opinion regarding -- I believe you had just
21  testified regarding that the position of the doors
22  would not have changed your opinion, whether they
23  would have been up fully or if they were on the
24  rise, so to speak.  Is that correct?
25     A   Well, I mean, there are discrepancies
```

First Choice Reporting & Video Services

Page 63

```
 1  Mr. Hairston.
 2     Q   I guess my question, then, is where,
 3  exactly, do you get the fact that he did not go in
 4  the pit?  Where did that information come from?
 5     A   Well, I think it would have to be obvious.
 6  I mean, if he went in the pit he would have seen
 7  Mr. Hairston.
 8     Q   Well, I'm looking at his deposition
 9  testimony.
10     MR. AHMED:  Do you want to pull it up?
11     THE WITNESS:  Okay.
12  BY MR. GAMBLER:
13     Q   Okay.  On page 55, lines 19 through, I
14  guess, 22, let's say, can you read what the
15  testimony was given by Mr. Nelson?
16     A   And you want to start with the question on
17  line 18 or just give the answer?
18     Q   If you want, you can start -- I guess the
19  first question -- the question began at 12, so if
20  you want to read 12 through 22.
21     A   Do you want me to read that into the
22  record?
23     Q   That would be fine.
24     A   Or just read it for myself and then answer
25  your question?
```

First Choice Reporting & Video Services

Page 62

```
 1  there.  And I don't know if we will ever know
 2  exactly how far up they were, if they were
 3  completely up.
 4        Mr. Nelson gives a couple of accounts that
 5  he is there, watching the door go up.  And then it
 6  seems like at one point in time he is almost looking
 7  at it through his mirrors.  I don't know exactly
 8  which story to believe on that.
 9        Mr. Hairston, on the other hand, indicates
10  that he is in the process of raising up the door,
11  and perhaps it's right at the point of being
12  complete when he is struck.  So both of those cannot
13  be true.  Both accounts can't be true, and the trier
14  of facts is just going to have to decide.  It's not
15  for me to decide which is correct.
16     Q   Okay.  And with regards to the testimony
17  given by Mr. Nelson in his deposition that you had
18  reviewed earlier, now, you had indicated that if
19  his -- that you believe that it was your opinion
20  that his deviation was because he didn't do the
21  GOAL.  Correct?  He didn't go outside and look.
22     A   Correct.  I mean, that's just one acronym.
23  It's a little cute type of thing that a driver can
24  remember.  The issue is he failed to go inside the
25  pit and surveil and see Mr. Nelson -- I mean,
```

First Choice Reporting & Video Services

Page 64

```
 1     Q   However you want to do it.
 2     A   Well, I will just read it and you can ask
 3  me a question.  Hang on one second.  Okay.
 4     Q   And I guess, specifically, my question is
 5  with regards to lines 19 and 20, where Mr. Nelson
 6  testified, "I looked around and there was nothing in
 7  the area."  Do you know what area he was talking
 8  about?
 9     A   I believe the area is the outside of the
10  building.
11     Q   Okay.  But would it be fair to say that
12  that's your assumption of his testimony?
13     A   Well, I mean, I think he would be able to
14  see the opening area where the trailer is going to
15  back in, as well as the outside of the building.  If
16  he is, in fact, ten feet away, and I'm just assuming
17  that because that's what he says, I think he says
18  that on line 25, it's about ten feet away, I believe
19  he is standing, I believe that he is describing.  He
20  has never said it any differently.  And he has never
21  tried to contend that he walked back any further,
22  but at a ten-foot view he is looking back to the
23  building and inside the hole that he is going to
24  back into.
25     Q   Okay.  Now, with regards to the ten feet,
```

First Choice Reporting & Video Services

Page 65

```
1    the question asked, in lines 23 through 25, was:
2    "How far was the trailer from the dock when you got
3    out to open the doors?"
4         And the answer was:  "About ten feet."
5    Correct?
6         A    Correct.
7         Q    But that doesn't actually say that he was
8    ten feet when he was, quote -- when he, quote,
9    looked around.  Would that be fair to say?
10        A    Well, it's not lined up in that particular
11   set of questions, no.
12        Q    Right.  Now, if you will move to page 56,
13   lines 10 through 12, can you please read those lines
14   into the record.
15        A    "Question:  Okay.  Were you able to see
16   clearly inside the warehouse?
17        Answer:  Very clearly."
18        Q    Okay.  Now, would that indicate that he
19   actually was able to see inside the warehouse?
20        MR. AHMED:  Object to form.
21   WITNESS ANSWERS:
22        A    Well, that's a very good question.  But I
23   think now we have to read the question on line 13,
24   where the question is:  "Okay.  Okay.  And you're
25   not trying to say that you couldn't see Mr. Hairston
```

www.firstchoicereporting.com        Worldwide Scheduling        800.939.0093

First Choice Reporting & Video Services

Page 66

```
1    because it was dark or too dark that you couldn't
2    see him?
3         "Answer:  It was broad daylight.
4         "Question:  Okay.  How do you know when to
5    stop?  When you pull back into the bay area, how do
6    you know where to stop?"
7         I don't believe that's relevant, that
8    answer.
9         Q    So that was speaking to -- the knowing
10   where to stop and whatnot, that was speaking to how
11   to actually enter the bay?
12        A    Well, how to position his trailer.  Where
13   he stops and opens up the doors of his trailers.  So
14   if that's when he opened up the doors of his
15   trailers.  That's when he says he does.  We don't
16   know for sure.  We are just going by his account.
17        But again, I think just to summarize, I
18   don't think there is any -- I'm not questioning
19   whether or not Mr. Nelson, while he was on the
20   ground and standing at his trailer, looked back into
21   that open area.  I do question -- and I don't see
22   that he ever contends that he walked back into that
23   hole, unless you have seen something I haven't seen,
24   and now would be a great time to bring that out and
25   let me think about that and try to synthesize that.
```

www.firstchoicereporting.com        Worldwide Scheduling        800.939.0093

First Choice Reporting & Video Services

Page 67

```
1         If, in fact, he goes back inside that
2    building and looks both ways in that pit, now what
3    we are saying is -- we are suggesting that
4    Mr. Hairston intentionally jumped down into that pit
5    area and was struck.  Now, it doesn't make sense why
6    he would do that, but that would be the suggestion.
7    Otherwise, Mr. Nelson would have seen him and said,
8    "Hey, young man, let's get out of here, because I'm
9    get ready to back up."  Or "Let me know,
10   Mr. Hairston, when you're finished so I can back
11   up."  He just flat didn't see Mr. Hairston.  That
12   can be the only reasonable conclusion.
13        Q    Okay.  Now, I'm going to show you
14   defendants' responses to plaintiff's
15   interrogatories.  I believe you indicated that you
16   had received and reviewed, prior to doing your --
17   completing your report, and specifically the
18   question and answer to number two.
19        A    Okay.
20        Q    Now, you had indicated previously that it
21   was your understanding that Mr. Nelson had not
22   contended that he actually went and looked in the
23   loading area.  Would that response suggest
24   differently?
25        A    I don't take it that way.
```

www.firstchoicereporting.com        Worldwide Scheduling        800.939.0093

First Choice Reporting & Video Services

Page 68

```
1         Q    Okay.  Please explain.
2         A    Well, again, I think we are -- I think we
3    are -- I think there are statements being made about
4    looking, and the real question is how thorough was
5    this look?  I like to call it surveillance.  You
6    know, when we think of surveillance cameras, we are
7    thinking about trying to find those hidden areas.
8    It's one thing to stand at the back of the trailer
9    and just look, see what you can see.  But there were
10   obviously latent areas, there were hidden areas
11   there obviously where Mr. Hairston was standing,
12   that had Mr. Nelson walked back into that open area
13   he would have seen him.  If Mr. Nelson had done
14   that, I think the testimony would be more like --
15   and his statement would be more like, "I walked all
16   the way back inside the warehouse.  I just didn't
17   look back at the dock."  That's what I take this as
18   saying.  And that seems to be somewhat consistent,
19   except he gives more details in his testimony, that
20   he looks back from his trailer -- and I'm not saying
21   he was standing right up against the trailer, and I
22   don't want to mince whether it's nine feet, eight
23   feet or whatever the distance is.  But whatever it
24   was, it wasn't enough.  He needed to walk back
25   inside the building, where he would have seen
```

www.firstchoicereporting.com        Worldwide Scheduling        800.939.0093

First Choice Reporting & Video Services

Page 69

1    Mr. Hairston, and then the accident wouldn't have
2    happened.
3           But I think what this is saying to me is
4    he looked around.  To me, that doesn't mean that
5    he -- he looked around the trailer and dock area,
6    just looking around for his vantage point, which is
7    some ways away, but he couldn't see around the
8    corner.
9        Q    But as we sit here today and you're
10   testifying today, do you have any specific statement
11   or evidence to indicate that Mr. Nelson did not look
12   inside the loading area?
13       A    We are going to have to be more specific
14   now, because we have been hammering this thing.  I
15   think we have got to go from looking at the dock to
16   looking inside the building.  We have got to draw,
17   for the jury, the distinction between just looking
18   from outside in or looking inside.  I see no
19   evidence that he went and looked inside the
20   building.
21          Now, maybe questions weren't asked to help
22   flesh that out.  And I don't know if you're
23   suggesting that after talking to the client that he
24   is going to say that now, and maybe we are going to
25   have to get some admissions, you know, to that end.

First Choice Reporting & Video Services

Page 70

1    But if that's going to be his statement now, I mean,
2    that might or might not affect my opinion.
3           I mean, if his story line is now but never
4    has been known that, yeah, he walked inside there
5    and looked around and did not see Mr. Hairston and
6    that's why he backed up, then that's different.  I
7    would want to know that.
8        Q    And to your knowledge, has that question
9    ever -- in the documents that you have reviewed, has
10   that question ever been asked?
11       A    In the way I just formed it?
12       Q    Yes.
13       A    Well, you know, an expert is always going
14   to ask it differently, you know, because I have
15   lawyers all the time say:  "I wish I had asked it
16   like that."  I think it was asked, I think, in good
17   faith.  I think those deposing him -- I think those
18   deposing him were attempting to try to elicit that
19   kind of information.  I think he just was continuing
20   to be resolute that, it seemed to me, his answers
21   were the perspective from the outside, not the
22   inside.
23       Q    And just for the record, that's your
24   interpretation.  Correct?
25       A    Well, just based on what he is saying,

First Choice Reporting & Video Services

Page 71

1    what he is answering.  Looking at the questions, he
2    has full opportunity to -- he was a guy -- as you
3    recognize, I mean, he was a guy that was not timid.
4    He was more than willing to elaborate.  And he had
5    full opportunity to say:  "Look.  I walked all the
6    way back in there and looked all around and he was
7    not there."  But he didn't say that.  You know, "I
8    looked in my mirrors."  He looked, I took it, from
9    the trailer.  That's my impression.  And if you're
10   telling me it's different or we know it's different,
11   then I want to know that.
12       Q    Okay.  Just to clarify, again, as we sit
13   here today, do you know of any specific deposition
14   testimony or discovery where the question was asked,
15   did you go walk into the bay and Mr. Nelson said,
16   no, that he did not?
17       MR. AHMED:  Object to form.
18   WITNESS ANSWERS:
19       A    As I sit here, I don't recall that
20   specific question or anything specifically close to
21   this concept of being inside being asked and
22   answered.
23       Q    And you indicated previously that would be
24   information that you would like to have?
25       MR. AHMED:  Object to form.

First Choice Reporting & Video Services

Page 72

1    WITNESS ANSWERS:
2        A    I would be interested in knowing that
3    answer.
4        Q    And would that be information that would
5    potentially affect your opinion that you have
6    previously issued?
7        A    My opinion could change, or at least could
8    be modified in that now I have got yet another
9    discrepancy in testimony.  And we often run up
10   against this.  I mean, sometimes we will have three
11   different; you know, a witness and his and hers, you
12   know?
13       Q    Absolutely.
14       A    And it's not for me to decide.  Sometimes,
15   if I have got a preponderance of evidence, I may go
16   ahead and side on one particular version, but now it
17   raises a whole other issue for me, and I think
18   anybody else looking at this, that if he does --
19   let's just assume for a second he does, in fact,
20   walk all the way back and go in there and surveil
21   around and Mr. Hairston is not there, how, in the
22   world, did Mr. Hairston ever get down there?  I
23   guess maybe the question is did he ever get down
24   there?
25       Q    That's a very good question, sir.

First Choice Reporting & Video Services

Page 73

1    MR. AHMED:  Object to form and move to strike.
2  BY MR. GAMBLER:
3    Q    With regards to your opinions and
4  conclusions contained in your report, have you
5  discussed these opinions with any other expert?
6    A    No.
7    Q    Are there any opinions or conclusions that
8  you have made that have not been discussed today or
9  are not in your report?
10    A    No.
11    Q    Is there any outstanding matter, related
12  to this case, that you have not yet formulated an
13  opinion or conclusion to?
14    MR. AHMED:  I'm just going to object, to the
15  extent we are taking the defense expert's deposition
16  in about a week or two, and we will be providing
17  that to him, along with Dr. Congdon and Dr. Zuehls'
18  deposition transcripts, and we will supplement his
19  report accordingly and make him available for
20  deposition.  And that goes along with any other
21  documents we may provide him.
22    You can answer the question.
23  WITNESS ANSWERS:
24    A    So I suppose if I am asked to look at
25  additional information, and it sounds like I will

www.firstchoicereporting.com      Worldwide Scheduling      800.939.0093

---

First Choice Reporting & Video Services

Page 74

1  be, I will have to look at that information and see
2  how, if at all, it will modify my opinions.
3    Q    But as we sit here today, you have not
4  been given any additional information?
5    A    That's correct.
6    Q    Would it be fair to say that your opinions
7  and conclusions conflict with the opinions given by
8  Dr. Baker?
9    MR. AHMED:  Object to form.
10  WITNESS ANSWERS:
11    A    In what respect?
12    Q    You indicated that you had an opportunity
13  to review Dr. Baker's report.  Correct?
14    A    Correct.
15    Q    And do you concur with Dr. Baker's
16  findings?
17    MR. AHMED:  Object to form.
18  WITNESS ANSWERS:
19    A    I don't think I'm prepared -- I just
20  looked at this today.  I don't think I'm prepared to
21  answer that.  And I think -- in all fairness to him,
22  I think it would be prudent to, since we are so
23  close to me being able to review his deposition, for
24  me to review that also in concert with looking at
25  his report.

www.firstchoicereporting.com      Worldwide Scheduling      800.939.0093

---

First Choice Reporting & Video Services

Page 75

1    The one thing that I did pick up in
2  looking at his report, I don't know Mr. Baker's
3  experience with regards to commercial truck driving
4  and training, I'm sure he is a highly qualified
5  individual, but I would beg to differ on at least a
6  couple fronts.  One is the sounding of the horn, I
7  think he indicated that's not necessary.  It's sort
8  of like saying wearing seat belts aren't necessary,
9  because I'm just going around the parking lot, or
10  something like that.
11    If you have got the safety device, and
12  it's mentioned in industry text -- now, the one
13  citation he has here may not mention it, but it is
14  mentioned in other industry texts -- why would you
15  not use it?
16    And we all hear, and I think almost every
17  juror is going to have heard of people blowing their
18  horn when they are backing up and going forward in a
19  commercial vehicle.  So that's one issue.
20    The other issue is -- and I haven't read
21  it so closely here to categorically state this, and
22  it's going to get back to what is proper
23  surveillance?  What is proper lookout?  What is a
24  proper observation of the area you're backing into?
25  I don't -- I hope that the report isn't designed

www.firstchoicereporting.com      Worldwide Scheduling      800.939.0093

---

First Choice Reporting & Video Services

Page 76

1  to -- looking from the back of the trailer is good
2  enough.  In safety, we are not looking for just good
3  enough.  We are looking for appropriate.  We are
4  looking for preventability, reasonableness.  And the
5  things I think I have described are reasonable.
6    So I agree with him on some of the other
7  things.  There may be just those couple of things I
8  have mentioned so far that I picked up on that I may
9  differ slightly with him.
10    Q    And as counsel has indicated previously,
11  his plan is to provide you with Dr. Baker's
12  deposition transcript, along with other deposition
13  transcripts so that you can potentially, if you deem
14  necessary, revise or review your opinions as
15  previously given.
16    MR. AHMED:  That's correct.
17  WITNESS ANSWERS:
18    A    Just one caveat, if I may.
19    Q    Yes, please.
20    A    I don't plan to, unless I was asked to do
21  so.  I'm one expert.  I don't find it my lot in life
22  to go around picking on other experts.  If he comes
23  to a different conclusion about the industry
24  standards than I do, I'm probably not going to write
25  a modification in my report.  If I feel like I'm

www.firstchoicereporting.com      Worldwide Scheduling      800.939.0093

First Choice Reporting & Video Services

1   right and he is wrong, it will just be for us to
2   sword fight at trial.  I'm not going to write a
3   report just to criticize him.  That's just my
4   personal philosophy.
5       Q    Okay.  Is there any information that you
6   have not yet received, that we have not yet gone
7   over, that would assist you in rendering any
8   conclusions or opinions regarding this matter?
9       A    I don't think so.
10      MR. GAMBLER:  That's pretty much about all I
11  have right now.
12           Has this case been reset for trial?
13      MR. AHMED:  Yeah.  We are reset for September.
14  I think we are on a -- this can be off the record.
15  (Discussion Off The Record)
16  BY MR. GAMBLER:
17      Q    This case is currently set for, I believe,
18  a three-week trial docket starting September 8,
19  2015.  Will you be available to testify at that time
20  at trial?
21      A    Say that again.
22      Q    September 8, 2015.
23      MR. AHMED:  It's a three-week docket, so it
24  could be any one of those dates during the three
25  weeks.

---

First Choice Reporting & Video Services

1   WITNESS ANSWERS:
2       A    I will make a way to be there, if I am
3   still living.  I always find a way to get there.  We
4   just work around that.  Everybody understands, if I
5   have got something else scheduled, this comes first.
6       MR. GAMBLER:  All right.  That's all I have for
7   right now.
8       MR. AHMED:  All right.  Let's take a quick
9   break.
10  (Break In Proceedings)
11           EXAMINATION
12  BY MR. AHMED:
13      Q    Sir, you were asked questions about have
14  you reviewed any statements or -- yeah.  Have you
15  reviewed any statements that you believe not to be
16  true?  My question is, your job is essentially to
17  determine whether proper procedure and protocols
18  were followed, not with whether someone is telling
19  the truth or not.  And that's really up to the jury.
20  Is that fair?
21      A    That's correct, for the most part.
22  Sometimes I might have a different opinion.  If it's
23  hours of service and I just know the forensic
24  evidence proves it, they are not telling the truth.
25      Q    Right.  And unless there is something

---

First Choice Reporting & Video Services

1   blatant -- and we are going to get to a few specific
2   things in a minute, unless there was something
3   blatant you would comment on, that seems to be
4   inconsistent with what actually happened.  Is that
5   fair?
6       A    That's fair.  That's typically what an
7   expert should do.
8       Q    I think you covered that you reviewed the
9   depositions and you did review the defendants'
10  answers to interrogatories and the request for
11  production, but there was a mixup with your file and
12  you're going to go back and locate those.  Is that
13  right?
14      A    That's correct.
15      MR. AHMED:  Neal, can I see defendants' answers
16  to interrogatories that we showed him earlier?
17      MR. GAMBLER:  Yes.
18      MR. AHMED:  Thank you.
19  EXAMINATION RESUMED BY MR. AHMED:
20      Q    And your report also says you reviewed
21  pleadings, plaintiff's response to interrogatories
22  and request for production, defendants' responses to
23  interrogatories and request for production,
24  statements by Hairston and Nelson, and then
25  depositions of Anthony Hairston and Ed Nelson and

---

First Choice Reporting & Video Services

1   your personal inspection of the accident scene on
2   August 20, 2014.
3       A    Correct.
4       Q    Okay.  All right.  And as I think I have
5   said multiple times now, we are going to provide you
6   with the deposition transcript of Mr. Baker.  And
7   you have reviewed his report and talked about that
8   in detail, did you not?  Well, you have talked about
9   that today.  And then we are also going to provide
10  you a few other documents, and we will ask that you
11  supplement your report to reflect that you reviewed
12  them and whether you have anything to add, as far as
13  your opinions.  Okay?
14      A    Okay.
15      Q    In addition to testifying to all your
16  opinions as you did today, are all your opinions
17  also contained within your report of August 29,
18  2014?
19      A    Yes.
20      Q    You were asked multiple times, and in
21  detail, about where Mr. Nelson said he did not go
22  back and look into the warehouse.  And I believe we
23  need to kind of talk about looking into the
24  warehouse.  And you can look into the warehouse from
25  a distance of ten to twenty feet, and then there is

First Choice Reporting & Video Services

Page 81

```
1   a difference of -- I think you used the word
2   surveillance and going up and looking into the pit
3   of the warehouse.  Can you explain the difference to
4   us?
5       MR. GAMBLER:  Objection to form.
6   WITNESS ANSWERS:
7       A   Sure.  The pit area is an area between the
8   edge of the building and the actual dock, itself.
9   It's ground level.  It's about six feet deep.  And I
10  measured it at one point on the side Mr. Hairston
11  would be standing, and I think it was about 10 or 11
12  feet.  So it's a fairly nice size area.  It's about
13  half the size of a room.
14          In my opinion, in being down there and
15  looking in, you cannot see around that wall.  I
16  could see around it a little bit now, only because
17  the opening has been modified.
18          But when I looked at the other similar
19  docks that they directed me to look at so I could
20  see, in general, how the dock would have looked back
21  in that time, there is just no way you would be able
22  to see around the corner.  You just can't see
23  through the wall.
24          So it's one thing for -- it could be true
25  that someone would say I looked into the dock area.
```

First Choice Reporting & Video Services

Page 82

```
1   But the question is, did you look inside the
2   building and around the wall that you can't see from
3   ten or twenty feet out?
4       Q   Okay.  And where, in these answers to
5   interrogatories, does Mr. Nelson say he looked into
6   the building, looked into the sides of the pits and
7   saw nobody standing there?
8       MR. GAMBLER:  Objection, form.
9   WITNESS ANSWERS:
10      A   It doesn't say that.
11      Q   Did he ever say that in his deposition
12  transcript?
13      A   No.
14      Q   Did he ever say that, at any point in his
15  entire defense of this case, up until this point?
16      A   No.
17      Q   All right.  And if you were to believe
18  that -- even if you were to believe Mr. Nelson and
19  he walked back into the warehouse, looked left --
20  looked right, looked left into the pit, what would
21  he have seen to the left there?
22      A   To the left, he would have seen
23  Mr. Hairston.
24      Q   What would he have seen dangling on the
25  side of that wall?
```

First Choice Reporting & Video Services

Page 83

```
1       A   He would have seen the chain that is used
2   to roll up the door.
3       Q   Okay.  What was Mr. Nelson's idea, as far
4   as -- what did Mr. Nelson believe was used to open
5   those doors?
6       A   He believed it was an automatic door
7   opener system.
8       Q   Would that be evidence that you find
9   important to indicate Mr. Nelson didn't go back and
10  look to see what was there?
11      A   That is a good piece of additional
12  evidence, yes.
13      Q   Okay.  I think I asked you in his answers
14  to interrogatories, and I asked you about his
15  deposition, in his handwritten statement, which I
16  will represent to you and I believe you testified,
17  in his deposition that he wrote that handwritten
18  statement on the day of this incident, does he say
19  anywhere in there he walked back and he looked
20  inside the pit and didn't see anybody there?
21      A   No.
22      Q   And had he done that, would he have seen
23  the chain?
24      A   Yes, he would have.
25      Q   And would you be able to see the chain and
```

First Choice Reporting & Video Services

Page 84

```
1   know it was a manual door if you're further back?
2   And if he were further back, and I believe -- even
3   if you were to believe Mr. Nelson, that he was ten
4   feet back, at a minimum, if he were to stand from
5   that distance and look into the warehouse, could he
6   see the chain that is used to open up the door?
7       MR. GAMBLER:  Object to the form.
8   WITNESS ANSWERS:
9       A   I don't know that he could see it from
10  outside.  I really don't know that answer.  It
11  depends on how -- this is not a technical term, but
12  it depends on how slack or dangly the chain might be
13  and whether or not it's overlapping over the edge.
14      MR. AHMED:  I think I'm about done.  Just give
15  me a minute.
16      Q   Anything that Ed Nelson's attorney asked
17  you today, has anything he asked you changed or
18  altered your opinions in any way?
19      A   No.
20      Q   Has he shown you any document that has
21  changed or altered your opinions in any way?
22      A   No.
23      Q   And if he did have something, I believe he
24  said it earlier, today is the time you would want to
25  see it, in case it did affect your opinions?
```

First Choice Reporting & Video Services

Page 85

```
1     A   Yes.  Or at a minimum, I would say if
2   there is information, I understand he may have some
3   privacy issues with his client, and maybe go through
4   a hypothetical and assume that.
5           Can I add something, though, while I'm
6   thinking about it, from the deposition transcript?
7     Q   Yes.
8     A   The question that we have been talking
9   about here a pretty good bit, about whether or not
10  the statements that we have from Mr. Nelson and the
11  testimony we have from Mr. Nelson and about trying
12  to interpret what he means when he says he looks
13  back into the warehouse, the question was raised in
14  the transcript here about whether or not he knew
15  about the layout inside the warehouse, and he
16  testified that he was not aware of the layout inside
17  the warehouse.
18          And he said, "Well, you have certainly
19  been inside the warehouse, haven't you?"
20          And he said:  "No.  You're not allowed in
21  there."  So how do you know what's inside the
22  warehouse?"
23          And he said, "Just from looking on the
24  outside in answer."
25    Q   And I'm glad you brought that up, because
```

www.firstchoicereporting.com     Worldwide Scheduling     800.939.0093

---

First Choice Reporting & Video Services

Page 87

```
1        THE WITNESS:  It's probably 75, starting down
2   at about --
3        MR. AHMED:  Line 19, maybe a little before
4   that.  Sure.  Line 16, the question is asked:  "What
5   is the layout of the inside of the warehouse?"  What
6   is his response?
7     A   "They won't let you in there."
8     Q   And then the question is asked:  "You have
9   seen the inside of the warehouse, haven't you?"
10  What is his response?
11    A   "Just from looking from the outside."
12       MR. AHMED:  All right.  That's all I have.
13                 REEXAMINATION
14  BY MR. GAMBLER:
15    Q   Now, with regards to the question that was
16  just asked with regards to the warehouse, is the
17  warehouse separate from the loading dock?
18    A   No.  The loading dock is contained within
19  the warehouse, is the way I would put it.
20    Q   When Mr. Nelson testified that he has seen
21  the warehouse from the outside, is it possible that
22  he could be talking about from the loading dock?
23       MR. AHMED:  Object to form.
24  WITNESS ANSWERS:
25    A   Well, I suppose it's possible, but that's
```

www.firstchoicereporting.com     Worldwide Scheduling     800.939.0093

---

First Choice Reporting & Video Services

Page 86

```
1   you were asked questions about the deposition
2   transcript, and I believe the deposition
3   transcript, in total, is 90 pages.  Do you remember
4   every question and every line, sitting here today,
5   from when you reviewed it?
6     A   Not every one.  Like I said earlier, I
7   have read it two times, and it seems like it's like
8   a good book; every time you read it again, you pick
9   up something a little additional.  But this has
10  always been my thought and my takeaway from
11  everything I have read, that this accident happened
12  because Mr. Nelson did not walk back inside that pit
13  area and surveil.
14          It's just that through the questions
15  today, a theory apparently has arisen that he did go
16  back there, and I just don't believe that's
17  consistent with everything that we have in his
18  testimony and his statements.
19    Q   Okay.  In his deposition did he, in fact,
20  say he has only looked at the warehouse from just
21  looking at it from the outside and not going in?
22    A   That's correct.
23       MR. GAMBLER:  What page?
24       MR. AHMED:  For the record, we are at page 76,
25  line --
```

www.firstchoicereporting.com     Worldwide Scheduling     800.939.0093

---

First Choice Reporting & Video Services

Page 88

```
1   not what he said, because he indicates they won't
2   let you in there.  And it's not inconsistent with a
3   lot of policies of various shippers or receivers,
4   that they don't -- for insurance reasons and other
5   reasons, they don't allow truck drivers on the
6   loading platform.
7     Q   Now, would he need to be on the loading
8   platform to properly view the area where the
9   incident occurred?
10    A   I don't know any reason he would need to
11  be in the warehouse, other than to walk inside that
12  pit area that he is going back into.  Again, this is
13  his responsibility.  I don't think anybody is going
14  to say they want to take over the responsibility,
15  once he enters their premises with that heavy piece
16  of equipment, to make sure it's safe.  But getting
17  up on the platform may be a violation of -- I don't
18  remember if it was a violation.  I don't even know
19  that that subject ever even came up with Wagner.
20    Q   So the pit and the warehouse, there is no
21  separation from the two?
22    A   Would it be helpful to look at some
23  pictures?  Have you been to the site?
24    Q   I have seen pictures of the site.  My
25  understanding -- and because I'm trying to outline
```

www.firstchoicereporting.com     Worldwide Scheduling     800.939.0093

(Re: Hairston vs. Nelson)                          8/11/14
                                                   (three cont.)

Fraz Ahzed
Zack VonRoenn

    Truck backing CASE

Nelson Transport
        Ed Nelson answer & drove

Hairston worked @ Wagner Paper
        in JAX.
    — was on grounds & struck by
       Tell whistle backing to Dock.

    — Dock Edge inside whse. bldg.

Need to see location since unique
        Set time to visit

EXHIBIT 1 — DORRITY

---

8/11

Fraz Ahzed — JAX FL.
Eric Block LAW FIRM
    Rob. Tad Gatton

Backing Accident
    Into Dock worker

o (904) 475-9400
c  u  704-7725


EXHIBIT 2 — DORRITY

                    Zack VonRoenn
                    (904) 945-0562
                    cell

---

Re: Hairston

Zack VonRoenn    @ Wagner Paper        site visit
Mr. Char              JAX, FL          8/20/14

Dock Door Entering Now Modified — Door #1
    Chain New on LEFT SIDE Near Steps
Dock Door #1 then Similar to Door #3 (Plastic)
    with chain to open on passenger side

Driver or yard person chocks wheels

Door uses manual pull chain pulley
I.S. width of wall to Dock = 72" (Depth = 6')
Original Door opening is North of lower sheet wall
    in yellow = 11'6"

Overhead Drivers Park in Reserved Parking Lot
Cannot gain Access (north) opening gate
                    View @ 7am

EXHIBIT 3 — DORRITY

---

Exhibit C



**DAVID L. DORRITY, MHRD, CDS, CDT**
Transportation Safety Consultant
**FEE SCHEDULE CONTRACT**

Corporate Office:                              August 18, 2014
Transportation Resources, Inc.                Re: Anthony Hairston

**OUR FEIN:**

**INITIAL RETAINER PAYMENT      $5,000**
All of this advance retainer payment is non-refundable.   The retainer represents your agreement to retain my services for coordination and expert services in your case.  In the event that I should decide not to participate in your case, this retainer less any expenses and billable time will be refunded.  You may not use my name in connection as your consultant or expert on any correspondence or legal disclosures without first paying this retainer.  The retainer will be applied to the final bill and is non-refundable.
    **RETAINER BREAKDOWN:** Initial setup and conference -$1,000 (includes misc. office expenses)
                        Used for Future Time (if any) -$4,000

**BILLABLE HOURLY RATES:**
    Office, Site, Travel and Consultation Time - $200 per hour (or fraction thereof).
    Trial Time - $2,500 per day (or fraction thereof – portal to portal).
    Deposition Time - $1,200 minimum for 3 hours (including travel (portal to portal) – $300 per hour thereafter.
        • Includes travel and waiting time before and during actual time of testimony.
        • Your firm must assume payment for depositions unless paid for in advance by someone else.

**EXPENSES by Category:**
    Auto travel              $ 1.00 per mile
    Copies                   $ .20 per copy (plus $75/hour for labor on big jobs)
    Airline & Lodging        Actual + 20% (unless prepaid by client)
    All others               Actual

**FUTURE PAYMENT TERMS:**
    All fees and expenses are payable to Transportation Resources, Inc. c/o David Dorrity within 10 days from the date of our invoice.  A 2% per month service charge is charged for past due bills.  Your agreement as confirmed by the signature(s) below commits the person(s) below as well as his/her firm for payment of all invoices for authorized work on your case, regardless of the opinions offered or the outcome of this case.
        **OUR FEIN: 570970930**

**CONFLICTS OF INTEREST:**
    It is expressly understood and agreed that this expert is being retained for his knowledge, skill, training and experience as a consultant in the transportation industry, and that it is understood and agreed to between the parties that this expert will not be provided with any trade secrets or other proprietary information that would create a conflict or preclude him from professional relationships with anyone else.

**CONTRACT ACCEPTED AND SIGNED BY:**
    Authorized Representative - X _Zachary Von R___  Date _8/20/14_
    Your Name _Zachary Von Roenn_ Firm Name _Johns + Von Roenn_
    Case Caption _Anthony Hairston v. Ed Nelson Transport_

Transportation Resources, Inc. – Two Meeting Place – Greenville, SC 29615
Tel (864) 288-7193 –Fax (864) 288-7008 – DLDorrity@aol.com

EXHIBIT 4 — DORRITY

FIRST CITIZENS BANK

**LAW OFFICE OF CHRIS JOHNS PA**
**DBA JOHNS & VON ROEHN**
**OPERATING ACCOUNT**
4901 ATLANTIC BLVD   904-396-9993
JACKSONVILLE, FL 32207

8/20/14

PAY TO THE
ORDER OF   Transportation Resources, Inc c/o David Dorrity   | $5,000.00

Five thousand dollars and 00/100 ————————   DOLLARS

Void after 90 days

MEMO Houston — Retainer

Chris Johns

AUTHORIZED SIGNATURE